689 A.2d 1238

**Doreen Kay MEANS**

v.

**BALTIMORE COUNTY, Maryland.**

**No. 20, Sept. Term 1996.**

Court of Appeals of Maryland.

March 4, 1997.

Harry W. Blondell (Bruce D. Hechmer, William J. Blondell, Jr., Chartered, on brief), Baltimore, for Appellant.

Mathew A. Weir, Assistant County Attorney (Virginia W. Barnhart, County Attorney, all on brief), Towson, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

RAKER, Judge.

In this Workers' Compensation case, we must decide whether post-traumatic stress disorder (PTSD) unaccompanied by physical disease may be compensable as an occupational disease under the Maryland Workers' Compensation Act, now codified as Title 9 of the Labor and Employment Article of the Maryland Code (1991 Repl.Vol., 1996 Cum.Supp.).[1] We shall hold that PTSD can be compensable as an occupational disease.

## I.

Appellant Doreen Kay Means has been employed by Baltimore County since 1986. She was initially hired as a Certified Respiratory Therapist, also known as a paramedic, based at the Towson Fire Station. Her duties as a paramedic involved responding to emergency calls and rendering aid at the scenes of accidents and other emergencies. Means filed the workers' compensation claim at issue in this case in February, 1994. She claimed that she "was diagnosed as suffering post-traumatic stress syndrome as a result of working a medic unit." Because Means's alleged PTSD is based on events occurring several years before the claim was filed, we turn now to a chronology of those events.

Means contends that the PTSD she allegedly suffered was caused by a particularly severe accident in 1987 involving a van carrying five teenagers. As the first medical personnel crew on the scene, she provided aid and declared the teenagers dead. A few days after this accident, Means responded to another emergency call, with equally serious injuries and fatalities.

---

1. Unless otherwise indicated, all statutory references are to the Maryland Workers' Compensation Act, codified as Maryland Code (1991 Repl.Vol., 1996 Cum.Supp.) Title 9, Labor and Employment Article.

Shortly after these incidents in March, 1987, Means was transferred, upon her request, to the Brooklandville Fire Station, a station with a reputation for receiving few emergency calls. After a year, Means was transferred to the Randallstown Fire Station where she remained until February, 1992.

Sometime prior to February, 1992, Means requested a demotion from paramedic to firefighter. In conjunction with the demotion to firefighter, she was transferred back to the Towson station. Although she had been demoted, she was on several occasions required to act as a paramedic at the Towson station. In 1992, Means was required to serve as the paramedic at a particularly gruesome motorcycle accident. The victim had not been wearing a helmet and his scalp had been torn away from his skull. After this accident, Means felt that she "woke up" and remembered the particularly traumatic accidents in 1987 when she had previously worked out of the Towson station.

After the motorcycle accident, Means frequently missed work and began seeing a psychiatrist and a therapist at the Psychological Services Section of the Baltimore County Police and Fire Departments. In her initial visit to the therapist on June 15, 1992, Means reported suffering from flashbacks of the van accident, headaches, crying spells, and difficulty concentrating. She reported that her return to the Towson station had "really upset her and brought back painful memories." In clinical intake notes dated June 17, 1992, the therapist treating Means noted that her "symptoms sound as though they could possibly be part of a post-traumatic reaction or disorder." The following notations appear at the conclusion of the clinical intake notes from Means's first meeting with the therapist:

INITIAL DIAGNOSIS (DSM–III–R)

    Axis I    R/O Post Traumatic Stress Disorder

    Axis II  Deferred

    Axis III None noted.

The therapist concluded that "[f]urther evaluation is necessary to determine if client may be experiencing a post-traumatic

reaction of delayed onset." Means remained under the therapists' care at the County's Psychological Services Section until October, 1992. Means was subsequently evaluated in July and October, 1995, by Dr. Joseph M. Eisenberg. Dr. Eisenberg wrote in his evaluation of Means that it was his "opinion that the initial diagnosis in 1992 should have been Post–Traumatic Stress Disorder, delayed onset." Means proffered that Dr. Eisenberg would testify that she suffered from PTSD caused by her employment as a paramedic.

Means filed a workers' compensation claim for PTSD in February, 1994, seeking compensation for 110 hours of missed work. She identified February 1, 1992, as the date of disablement, the same date as her transfer back to the Towson station. On January 6, 1995, the Workers' Compensation Commission held a hearing on Means's claim and concluded that she had not suffered an occupational disease arising out of and in the course of her employment. Means filed a petition for judicial review in the Circuit Court for Baltimore County. *See* § 9–737.

The County filed a motion for summary judgment. The County presented two arguments: (1) that as a matter of law, Means failed to establish that she suffered from PTSD; and (2) that as a matter of law, PTSD may not form the basis of an occupational disease claim. The trial court granted the County's motion for summary judgment on the second ground. Means noted a timely appeal to the Court of Special Appeals, and we granted certiorari before consideration by that court. We shall reverse.

## II.

### A.

In Maryland, workers' compensation encompasses two categories of compensable events: accidental personal injury and occupational diseases. §§ 9–501, 9–502; *Lovellette v. City of Baltimore,* 297 Md. 271, 279, 465 A.2d 1141, 1146 (1983). Section 9–101(b) defines "accidental personal injury" as follows:

(b) *Accidental personal injury.*—"Accidental personal injury" means:

(1) an accidental injury that arises out of and in the course of employment;

(2) an injury caused by a willful or negligent act of a third person directed against a covered employee in the course of the employment of the covered employee; or

(3) a disease or infection that naturally results from an accidental injury that arises out of and in the course of employment, including:

(i) an occupational disease; and

(ii) frostbite or sunstroke caused by a weather condition.

This Court has described accidental injuries as those that involve "the injury and destruction of tissue by the application of external force, such as a blow." *Foble v. Knefely,* 176 Md. 474, 486, 6 A.2d 48, 53 (1939). Occupational disease is defined in § 9–101(g) of the Act as follows:

(g) *Occupational disease.*—"Occupational disease" means a disease contracted by a covered employee:

(1) as the result of and in the course of employment; and

(2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated.

While the Act does not further define "occupational disease," this Court has further delineated the term

as some ailment, disorder, or illness which is the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom, and is ordinarily slow and insidious in its approach.

*Foble,* 176 Md. at 486, 6 A.2d at 53.

Not all diseases which meet this definition are compensable. Section 9–101(g) must be read in conjunction with § 9–502(d).[2] Section 9–502 reads, in pertinent part:

---

2. In *Davis v. Dyncorp,* 336 Md. 226, 235–236, 647 A.2d 446, 450–51, (1994), we observed:

(d) *Limitation on liability.*—An employer and insurer are liable to provide compensation . . . only if:

    (1) the occupational disease that caused the death or disability:

        (i) is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of disablement; or

        (ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employment in which the covered employee was employed before the date of disablement. . . .

The limitations imposed by § 9–502(d) seek to ensure that only those diseases directly caused by the employment be compensable. *Davis v. Dyncorp,* 336 Md. 226, 236, 647 A.2d 446, 451 (1994).

Occupational diseases have not always been compensable under the Act. The legislative history of the Act suggests that the General Assembly was reluctant to recognize occupational diseases as compensable under workers' compensation. *See Miller v. Western Electric Co.,* 310 Md. 173, 181, 528 A.2d 486, 490 (1987); *see generally* Thomas S. Cook, *Workers' Compensation and Stress Claims: Remedial Intent and Restrictive Application,* 62 NOTRE DAME L.REV. 879, 889–91 (1987) (discussing state legislatures' early and continuing reluctance regarding occupational disease claims). In 1939, however, the General Assembly recognized occupational dis-

---

    Simply because a disease falls within § 9–101(g)'s definition of occupational disease, however, does not mean it is compensable. Section 9–101(g) must be read in conjunction with § 9–502(d), which limits an employer's and insurer's liability to those cases where the occupational disease that causes the disablement is either "due to the nature of an employment in which hazards of the occupational disease exist". . . . Section 9–502(d) further provides that in order to be a compensable occupational disease, "on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment. . . ."
(footnote omitted).

ease "as a problem, like on-the-job accidental injury, that an industrial society had to address in a comprehensive fashion," and enacted Maryland's first occupational disease statute. *Miller,* 310 Md. at 182, 528 A.2d at 491; *see* 1939 Md.Laws ch. 465.

Chapter 465 of the Acts of 1939 enumerated thirty-four diseases that were compensable under the Act as occupational diseases. The statute required employers to compensate only for those thirty-four specified diseases and only when caused by the process or occupation specified. For example, asbestosis was compensable if arising out of "[a]ny process or occupation involving an exposure to or direct contact with asbestos dust." 1939 Md. Laws ch. 465, § 1, at 995. In 1951, the occupational disease statute was repealed and reenacted, 1951 Md. Laws ch. 289, § 1, at 752, replacing the schedule format with the more general definition of occupational disease that remains in effect today. With this statutory framework and history in mind, we now turn to examine the compensability of PTSD under Maryland's Act.

## B.

The compensability of work-related mental disabilities unaccompanied by physical illness has been a controversial topic in workers' compensation law over the past decade. Cook, *supra,* at 879. Workers' compensation claims based on mental injuries caused by mental stimuli have been coined "mental-mental" claims, in contrast to "physical-mental" [3] and "mental-physical" [4] claims. *See* A. LARSON, THE LAW OF WORKMEN'S COMPENSATION, § 42.20 (1996). Means makes a mental-mental claim—she alleges that a mental stimulus (the memory of the traumatic accidents) caused a mental injury (PTSD). A ma-

---

**3.** "Physical-mental" refers to physical impact that causes mental injury. *See* LARSON, *supra* note 3, at § 42.20.

**4.** Mental-physical claims refers to a mental stimulus causing physical injury. *See* A. LARSON, THE LAW OF WORKMEN'S COMPENSATION, § 42.20 (1996).

jority of the states have found mental-mental claims to be compensable under some circumstances.[5]

This Court has recognized mental-mental claims to be compensable in the context of accidental injury. *Belcher v. T. Rowe Price,* 329 Md. 709, 621 A.2d 872 (1993). In *Belcher,* the employee, a secretary for T. Rowe Price Foundation, worked

---

5. The following states have recognized the compensability of mental-mental claims under some circumstances either in judicial opinions or by statute: Alaska, Alaska Stat. § 23.30.395(17) (1996); Arizona, *Fireman's Fund Ins. Co. v. Industrial Comm'n,* 119 Ariz. 51, 579 P.2d 555 (1978); Arkansas, *Owens v. National Health Labs.,* 8 Ark.App. 92, 648 S.W.2d 829 (1983); California, Cal.Lab.Code § 3208.3 (Deering 1996); Colorado, Colo.Rev.Stat. § 8–41–302(1) (1996); Delaware, *State v. Cephas,* 637 A.2d 20, 27 (Del.1994); District of Columbia, *Sturgis v. District of Columbia Dept. of Employment Servs.,* 629 A.2d 547, 551 (D.C.1993); Hawaii, *Royal State Nat. Ins. Co. v. Labor & Indus. Relations Appeals Bd.,* 53 Haw. 32, 487 P.2d 278 (1971); Idaho, *O'Loughlin v. Circle A Constr.,* 112 Idaho 1048, 739 P.2d 347 (1987); Illinois, *Pathfinder Co. v. Industrial Comm'n,* 62 Ill.2d 556, 343 N.E.2d 913 (1976); Indiana, *Hansen v. Von Duprin, Inc.,* 496 N.E.2d 1348 (Ind.Ct. App.1986), *rev'd on other grounds,* 507 N.E.2d 573 (Ind.1987); Iowa, *Dunlavey v. Economy Fire & Casualty Co.,* 526 N.W.2d 845 (Iowa 1995); Kentucky, *Yocom v. Pierce,* 534 S.W.2d 796 (Ky.1976); Louisiana, La.Rev.Stat. § 23:1021 (1996); Maine, Me.Rev.Stat. tit. 39–A, § 201 (1995); Maryland, *Belcher v. T. Rowe Price,* 329 Md. 709, 621 A.2d 872 (1993); Massachusetts, *Albanese's Case,* 378 Mass. 14, 389 N.E.2d 83 (1979); Michigan, *Carter v. General Motors Corp.,* 361 Mich. 577, 106 N.W.2d 105 (1960); Mississippi, *Borden, Inc. v. Eskridge,* 604 So.2d 1071 (Miss.1991); Missouri, *Fogelsong v. Banquet Foods Corp.,* 526 S.W.2d 886 (Mo.Ct.App.1975); New Jersey, *Goyden v. State Judiciary,* 256 N.J.Super. 438, 607 A.2d 651, 655 (App.Div.1991), *aff'd per curiam,* 128 N.J. 54, 607 A.2d 622 (1992); New Mexico, N.M.Stat.Ann. § 52–1–24 (1996); New York, *Wolfe v. Sibley, Lindsay & Curr Co.,* 36 N.Y.2d 505, 369 N.Y.S.2d 637, 330 N.E.2d 603 (1975); North Carolina, *Jordan v. Central Piedmont Community College,* 124 N.C.App. 112, 476 S.E.2d 410 (1996); North Dakota, N.D.Cent.Code § 65–01–02(9)(a)(3) (1995); Oregon, Or.Rev.Stat. § 656.802 (1995); Pennsylvania, *Wilson v. Workmen's Compensation Appeal Bd.,* 542 Pa. 614, 669 A.2d 338, 344 (1996); Rhode Island, R.I.Gen.Laws § 28–34–2(36) (1996); South Carolina, *Stokes v. First Nat'l Bank,* 298 S.C. 13, 377 S.E.2d 922 (1988); Tennessee, *Jose v. Equifax, Inc.,* 556 S.W.2d 82 (Tenn.1977); Texas, *Bailey v. American Gen. Ins. Co.,* 154 Tex. 430, 279 S.W.2d 315 (1955); Utah, Utah Code Ann. § 35–1–45.1 (1996); Vermont, *Bedini v. Frost,* 678 A.2d 893, 894 (Vt.1996); Virginia, *Burlington Mills Corp. v. Hagood,* 177 Va. 204, 13 S.E.2d 291 (1941); Washington, *see Department of Labor & Indus. v. Kinville,* 35 Wash.App. 80, 664 P.2d 1311 (1983); Wisconsin, Wis.Stat. § 102.01(c) (1995–96); Wyoming, *Consolidated Freightways v. Drake,* 678 P.2d 874 (Wyo.1984).

on the top floor of an office building located next to a construction site. One morning a three-ton beam broke loose from its crane and crashed through the roof of T. Rowe Price's building, landing with a deafening noise only five feet from Belcher's desk. The power in the building went out, pipes and wires were ripped apart, and debris covered Belcher. Thereafter, Belcher experienced panic attacks, nightmares, and chest pains which were diagnosed as symptoms of PTSD. *Id.* at 713–14, 621 A.2d at 874–75.

This Court held that Belcher was entitled to workers' compensation for her injuries because they resulted from an accidental personal injury under the terms of the Act. We reasoned that when a mental injury is precipitated by an "unexpected and unforeseen event that occurs suddenly or violently," *id.* at 740, 621 A.2d at 887 (quoting *Sparks v. Tulane Medical Ctr. Hosp. & Clinic,* 546 So.2d 138, 147 (La.1989)), a worker may recover for that mental injury if the injury is "capable of objective determination." *Id.* at 746, 621 A.2d at 890.

One year later, this Court addressed the question of mental-mental claims in the context of occupational diseases. *Davis v. Dyncorp,* 336 Md. 226, 647 A.2d 446 (1994). Davis was a computer operator employed by Dyncorp. Davis alleged that he was continually subjected to serious harassment by his co-workers. The sustained harassment, Davis contended, caused PTSD which prevented him from returning to work. *Id.* at 228, 647 A.2d at 447. In contrast to *Belcher,* Davis maintained that he was entitled to compensation because he suffered an occupational disease, not an accidental personal injury.

This Court held that Davis's claim did not constitute an occupational disease under §§ 9–101(g) and 9–502(d)(1)(i) because the alleged disease was not "due to the nature of an employment in which hazards of the occupational disease exist." § 9–502(d)(1)(i). We concluded that "nothing peculiar to Davis's duties as a computer operator ... made him more susceptible to harassment than in any other kind of employment." *Davis,* 336 Md. at 237, 647 A.2d at 451.

Because Davis's particular claim could not constitute an occupational disease under the Act, we did not reach the issue of whether, as a matter of law, gradually resulting, purely mental diseases could ever be compensable occupational diseases. *Id.* at 238, 647 A.2d at 452. In conclusion, however, we addressed the possibility that gradually resulting mental diseases may be compensable occupational diseases. Judge Chasanow, writing for the Court, observed:

> [W]e are not willing to rule out the possibility that some gradually resulting, purely mental diseases could be compensable occupational diseases or that there may be circumstances where work-induced stress may result in a compensable occupational disease. Today, we merely hold that the mental disease resulting from the harassment encountered by Davis was not due to the nature of his employment.

*Id.* at 238–39, 647 A.2d at 452.

## C.

This case requires us to resolve the issue that we did not reach in *Davis, i.e.,* whether, as a matter of law, PTSD should be excluded from compensable occupational diseases. We reach this issue because, unlike the occupation of computer operator in *Davis,* the occupation of paramedic is "an employment in which hazards of the occupational disease exist." § 9–502(d)(1)(i). We hold today that PTSD may be compensable as an occupational disease under the Workers' Compensation Act if the claimant can present sufficient evidence to meet the statutory requirements. *See* § 9–101(g) (disease must be contracted as the result of and in the course of employment and the disease must cause the employee to become incapacitated); § 9–502(d)(1)(i) (disease must be due to nature of an employment in which the hazards of the occupational disease exist).

In *Davis,* 336 Md. at 237, 647 A.2d at 451, we posed the question as follows:

[T]he question becomes whether mental disease caused by his job harassment may be reasonably characterized as due to the general character of Davis's employment.

We conclude that Means's asserted PTSD may be reasonably characterized as due to the general character of her employment as a paramedic.[6] Unlike the computer operator in *Davis* who divided his time between programming computers and reading manuals, Means's employment as a paramedic exposed her to events that could potentially cause PTSD.[7]

We conclude that PTSD may be compatible with the general character of occupational disease. We have consistently described occupational disease as "some ailment, disorder, or illness which is the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom, and is ordinarily slow and insidious in its approach."[8] *Foble v. Knefely*, 176 Md. 474, 486, 6 A.2d 48, 53

---

**6.** The American Psychiatric Association's diagnostic guidelines for PTSD define the required traumatic event as one in which both of the following criteria are met:

(1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others
(2) the person's response involved intense fear, helplessness, or horror.

AMERICAN PSYCHIATRIC ASSOCIATION, QUICK REFERENCE TO THE DIAGNOSTIC CRITERIA FROM DSM–IV 209 (1994).

**7.** In its brief to this Court, the County contends that Means's alleged PTSD was caused by her transfer to the Towson Fire Station after her demotion to firefighter. The County argues that transfers are not due to the general character of employment as a paramedic or firefighter. Means, on the other hand, contends that the 1987 accidents caused her PTSD and that the transfer to Towson only caused her to "wake up" to her feelings about those incidents. We do not need to resolve this dispute because we do not decide whether Means's injury is compensable, only that it is not precluded as a matter of law.

**8.** In the context of disease, Webster's Third New International Dictionary defines insidious as "developing so gradually as to be well established before becoming apparent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1169 (1986).

Dr. Joseph Eisenberg, Means's expert witness, states in his evaluation of Means that her "relatively high level of functioning prior to June,

(1939); *see also Davis,* 336 Md. at 233, 647 A.2d at 449; *Lovellette v. City of Baltimore,* 297 Md. 271, 280, 465 A.2d 1141, 1146 (1983). In the American Psychiatric Association's Diagnostic and Statistical Manual (DSM–IV), a condition may only be diagnosed as PTSD after the symptoms have persisted for over one month. AMERICAN PSYCHIATRIC ASSOCIATION, QUICK REFERENCE TO THE DIAGNOSTIC CRITERIA FROM DSM–IV 211 (1994). Although the outbreak of symptoms may be experienced a few days to a few weeks after the trauma, symptoms may also be delayed. *See* H. KAPLAN ET AL., SYNOPSIS OF PSYCHIATRY 610 (7th ed. 1994). Based on these criteria, PTSD can be slow and insidious.

Although the structure and history of the occupational disease statutes reflect an intent by the legislature to treat occupational disease differently from accidental injury in some respects, in light of our holding in *Belcher* we see no sound reason to treat them differently in this regard.[9] In *Miller,* we noted one basis for treating occupational disease and accidental injury differently:

> The problems of showing disability and causation simply appear less formidable in the [accidental injury] context. The injury, at least to the lay eye, is relatively easy to see and evaluate, and its connection to the employment is more readily apparent.

*Miller,* 310 Md. at 185, 528 A.2d at 492. This quotation echoes the criticisms of those who oppose compensation for workers who suffer from PTSD arising out of their employment. This Court has addressed PTSD in other contexts, and we have concluded that expert testimony concerning PTSD is "as

---

1992, is to her credit but is also a reflection of the *insidious nature and onset* of the traumatic stress and reaction."

**9.** Whether mental-mental claims should be excluded under the Act is a matter best addressed by the General Assembly. *See, e.g.,* ALASKA STAT. § 23.30.395(17) (1996) (statute amended following court decision in *Fox v. Alascom,* 718 P.2d 977 (Alaska 1986)); W.VA.CODE § 23–4–1f (1996) (statute amended following court decision in *Breeden v. Workmen's Compensation Commissioner,* 168 W.Va. 573, 285 S.E.2d 398 (1981)).

evidentiarily reliable as an opinion by an orthopedist who has been engaged only to testify ascribing a plaintiff's subjective complaints of low back pain to soft tissue injury resulting from an automobile accident." *State v. Allewalt,* 308 Md. 89, 99, 517 A.2d 741, 746 (1986); *see also Hutton v. State,* 339 Md. 480, 491–93, 663 A.2d 1289, 1294–95 (1995); *Acuna v. State,* 332 Md. 65, 629 A.2d 1233 (1993). Workers who suffer back pain or soft tissue injury as a result of accidents or diseases arising in the course of employment are not denied compensation due to the difficulty of verification. Judge Orth, writing for the Court in *Belcher,* observed:

> We have come to appreciate that a mind may be injured as well as a body maimed. A person's psychic trauma does not vary depending upon the type of legal action in which the harm is scrutinized. . . . The inability to work and the loss of earning power are the same.

*Belcher,* 329 Md. at 738, 621 A.2d at 886. Other states that maintain a distinction between accidental injury and occupational disease in their workers' compensation statute similarly have held mental disorders to be compensable as occupational diseases. *E.g., City of Aurora v. Industrial Comm'n,* 710 P.2d 1122, 1123 (Colo.Ct.App.1985); *Martinez v. University of California,* 93 N.M. 455, 601 P.2d 425, 426 (1979); *Pulley v. City of Durham,* 121 N.C.App. 688, 468 S.E.2d 506, 510 (1996); *James v. State Accident Ins. Fund,* 290 Or. 343, 624 P.2d 565, 568 (1981); *Gatlin v. City of Knoxville,* 822 S.W.2d 587, 590 (Tenn.1991); *see O'Loughlin v. Circle A. Constr.,* 112 Idaho 1048, 739 P.2d 347, 353 (1987).

We stress that we do not today hold that Means's alleged PTSD is necessarily compensable as an occupational disease. We hold only that if the claimant can successfully prove that PTSD meets the statutory requirements, PTSD is not as a matter of law excluded from compensable occupational diseases and that the non-physical nature of Means's claim does

not *per se* exclude her from coverage under the Act.[10] Means must prove that she contracted PTSD "as the result of and in the course of employment." § 9–101(g). Furthermore, she must prove that the mental illness she suffers is due to the

**10.** We do not address today whether occupational disease based on mental illness shall be governed by special standards distinct from those applied in cases of physical disease. This issue has been neither briefed nor argued before this Court. We point out, however, that there are various tests, standards, and conditions for compensability among the many states that compensate mental-mental claims.

There are essentially four different standards that courts apply to determine which mental injuries will be compensable. *Cf.* LARSON, *supra* note 3, § 42.25. Some states treat mental injuries no differently than physical injuries or physical diseases and allow compensation as long as the mental injury arises out of the employment. *See, e.g., City of Aurora v. Industrial Comm'n,* 710 P.2d 1122, 1124 (Colo.Ct.App.1985) (addressing occupational disease); *Hansen v. Von Duprin, Inc.,* 507 N.E.2d 573, 576 (Ind.1987); *Albanese's Case,* 378 Mass. 14, 389 N.E.2d 83 (1979); *Martinez v. University of California,* 93 N.M. 455, 601 P.2d 425 (1979) (occupational disease).

Other states apply an objective test; that is, a mental injury is compensable if the average worker would have been harmed by the stressful conditions in the workplace. *E.g., State v. Cephas,* 637 A.2d 20, 27 (Del.1994); *Sturgis v. District of Columbia Dept. of Employment Servs.,* 629 A.2d 547, 551 (D.C.1993); *Goyden v. State Judiciary,* 256 N.J.Super. 438, 607 A.2d 651, 655 (App.Div.1991), *aff'd per curiam,* 128 N.J. 54, 607 A.2d 622 (1992); *Wilson v. Workmen's Compensation Appeal Bd.,* 542 Pa. 614, 669 A.2d 338, 344 (1996).

The third test requires that the claimant prove that the injurious mental stimulus was greater than the usual day-to-day stress experienced in the workplace. *E.g.,* ALASKA STAT. § 23.30.395(17) (1996); ME.REV.STAT. ANN. tit. 39–A, § 201(3) (1995); OR.REV.STAT. § 656.802 (1995); R.I.GEN.LAWS § 28–34–2 (1996); *Owens v. National Health Labs.,* 8 Ark.App. 92, 648 S.W.2d 829, 831 (1983); *Dunlavey v. Economy Fire & Casualty Co.,* 526 N.W.2d 845, 853 (Iowa 1995); *Borden, Inc. v. Eskridge,* 604 So.2d 1071, 1073–74 (Miss.1991); *Wilson,* 669 A.2d at 344 (applying both the objective test and the abnormal working condition test); *Bedini v. Frost,* 678 A.2d 893, 894 (Vt.1996); *Consolidated Freightways v. Drake,* 678 P.2d 874, 878 (Wyo.1984).

Finally, some states allow recovery for purely mental injuries only when induced by a traumatic event, shock, or fright in the workplace. *E.g.,* LA.REV.STAT. § 23:1021 (1996); N.M.STAT.ANN. § 52–1–24 (1996); UTAH CODE ANN. § 35–1–45.1 (1996); *Pathfinder Co. v. Industrial Comm'n,* 62 Ill.2d 556, 343 N.E.2d 913, 917 (1976); *Wolfe v. Sibley, Lindsay, & Curr Co.,* 36 N.Y.2d 505, 509–10, 369 N.Y.S.2d 637, 641–42, 330 N.E.2d 603, 606 (1975); *Gatlin v. City of Knoxville,* 822 S.W.2d 587, 590 (Tenn.1991); *Hercules, Inc. v. Gunther,* 13 Va.App. 357, 412 S.E.2d 185, 189 (1991).

nature of a paramedic's job and that employment as a paramedic entails the hazard of developing PTSD. § 9–502(d)(1)(i).

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY BALTIMORE COUNTY.*