984 A.2d 281

**BLACK AND DECKER CORPORATION, et al.**

v.

**Norman L. HUMBERT.**

**No. 0512, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Nov. 25, 2009.

Lance G. Montour (Humphreys, McLaughlin & McAleer, LLC, on brief), Baltimore, for Appellant.

Kenneth J. Coughlan (Law Offices of Anne Hoke, LLC, on brief), Baltimore, for Appellee.

Panel: DAVIS, SALMON and DEBORAH S. EYLER, JJ.

SALMON, J.

Norman Humbert ("Humbert"), a licensed electrician, worked for Black and Decker Corporation ("Black and Decker") since 1993. He filed a claim with the Maryland Workers' Compensation Commission ("Commission"), alleging that he sustained an occupational disease of impingement syndrome of the right shoulder arising out of and in the course of employment with Black and Decker. A hearing was held before the Commission in March of 2005. The Commission disallowed Humbert's claim. After Humbert's request for a rehearing was denied, he filed a petition for judicial review in the Circuit Court for Baltimore County on May 26, 2005.

A jury trial was held on January 10, 2008. Black and Decker introduced into evidence the decision of the Commis-

sion but called no witnesses. Humbert was the sole live witness. He also introduced into evidence the video deposition of Dr. Raymond Wittstadt, a Board Certified Orthopaedic Surgeon. At the conclusion of the evidentiary phase of the case, Black and Decker moved for judgment in its favor. The trial judge denied the motion.

The jury, after twenty minutes of deliberation, answered "yes" to the following question:

1) Did Norman L. Humbert sustain an occupational disease of impingement syndrome of the right shoulder arising out of and in the course of his employment with Black and Decker Corporation?

Black and Decker filed a motion for judgment notwithstanding the verdict and/or, a motion for new trial. Both motions were denied.

Black and Decker filed a timely appeal to this Court in which it contends that the trial judge erred: 1) in denying its motion for judgment and 2) in declining to give three instructions proposed by it.

## I.

### A. Humbert's Trial Testimony

As an employee of Black and Decker, Humbert's primary job was that of a senior electrician. It was his responsibility "to take care of facilities" such as electric lighting. His work was performed at the corporate headquarters in Towson. At his work site, there was constant remodeling in progress and many of the tasks in which he engaged caused him to work in the vicinity of the ceilings. More specifically, while standing on a ladder and reaching up to the ceiling, he frequently would replace lights, take ceilings down, put ceilings up, and pull wires down and then install new wires in the ceiling.

In addition to his job as an electrician, Humbert did vehicle maintenance work and, after snowfalls, operated a front-end loader to remove snow. He also sometimes worked for Black and Decker as a plumber and carpenter. Additionally, he

sometimes maintained vehicles. He testified: "Lots of that is laying on the ground reaching up into the . . . engine compartment." When he operated a front-end loader to remove snow, he used his right arm to push and pull levers.

Humbert first saw Dr. Wittstadt for a problem with his right shoulder in November of 2003. At the time of his initial visit, he did not relate his shoulder problem to any activities at work but, after subsequent visits, and after talking to Dr. Wittstadt, he discovered that his problem was "possibly work related."

In December of 2003, Humbert's shoulder was "already fatigued and sore" and the more he operated the front-end loader, the more it hurt. In his words, "I just couldn't do it anymore." According to Humbert, operating the front-end loader was "the straw that broke the camel's back." He was treated by Dr. Wittstadt up until June of 2004, when Dr. Wittstadt operated on Humbert's right shoulder to remove a bone spur. Once the bone spur was removed, Humbert was asymptomatic. He has had no shoulder problems, and has not seen Dr. Wittstadt as a patient, since June of 2004.

Humbert further testified that he has been an electrician for twenty-five years and that the "overhead activities, working the ceilings, etc." were job duties typical of those performed by all electricians. Moreover, he first noted "shoulder impingement syndrome" symptoms "after so many times of working the ceiling. . . ." In his words, after "working the ceiling" he "started to get fatigued and then it just gradually got worse and worse . . . [due to] constant use." His first symptoms were "burning, stinging, fatigue" of the right shoulder and "[u]sually the higher [he] reached the worse it would get."

## B. Dr. Wittstadt's Testimony

Since 1998 Dr. Wittstadt has specialized in the treatment of the shoulder. Ultimately he diagnosed Humbert with having "impingement syndrome" of the right shoulder. The impingement occurred when the acromion (the front edge of the

shoulder blade) rubs, or impinges, upon a tendon as the arm is lifted. The impingement (or rubbing) is caused by a bone spur. Impingement syndrome is also called tendonitis.

Dr. Wittstadt first saw Humbert on November 5, 2003. The patient said that he was an electrician and that for several months he had been having pain in his right shoulder. The pain bothered him most at night when he attempted to sleep. Dr. Wittstadt gave Humbert a cortisone injection and saw him in his office in December 2003, and again in January 2004. On January 21, 2004, an MRI was performed. That diagnostic procedure showed that Humbert had "moderate tendonitis in the lateral supraspinatus tendon."

In February of 2004, Humbert gave Dr. Wittstadt further details as to his job duties as an electrician. Humbert reported that as an electrician he did a "lot of overhead work" and, in addition, did other types of work, including driving "a type of tractor" that involved "a lot of forward motions with his arm."

Dr. Wittstadt testified that Humbert's diagnostic studies demonstrated that he had a bone spur on the underside of the acromion in his right shoulder, which contributed to the development of the shoulder impingement syndrome from which he suffered. In Dr. Wittstadt's words "it takes two things to develop a problem." The two things were: 1) activities such as continuous reaching overhead that results in inflammation and 2) the presence of a spur. He explained that the mere presence of a spur, which is often a congenital condition, does not mean that a person will develop impingement syndrome. But with the spur present, people often develop impingement syndrome by years of repetitive activities such as reaching overhead. That reaching motion causes the tendon to rub against the bone spur. He further testified that, based on the job description provided to him by Humbert, the claimant seemed to be engaged in "the type of occupation that would ... cause these problems to develop."

On cross-examination Dr. Wittstadt reiterated that the claimant's job did not, alone, cause the bone spur to develop.

Instead, it was both the bone spur, which was not work related, in combination with the overhead activities that Humbert engaged in due to his occupation as an electrician, that caused the syndrome.

## II.

### A. Black and Decker's Motion For Judgment

■ Maryland Code (2008 Repl.Vol.), § 9–502 of the Labor and Employment Article reads, in pertinent part, as follows:

(c) *Liability of employer and insurer.*—Subject to subsection (d) of this section and except as otherwise provided, an employer and insurer to whom this subsection applies shall provide compensation in accordance with this title to:

(1) a covered employee of the employer for disability of the covered employee resulting from an occupational disease; or

(2) the dependents of the covered employee for death of the covered employee resulting from an occupational disease.

(d) *Limitations on liability.*—An employer and insurer are liable to provide compensation under subsection (c) of this section only if:

(1) the occupational disease that caused the death or disability:

(i) *is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of disablement; or*

(ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employment in which the covered employee was employed before the date of disablement; and

(2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee.

In its motion for judgment,[1] Black and Decker first asserted that Dr. Wittstadt made it clear in his testimony that developing a "bone spur is not occupational in character." The movant's argument continued: "the cause of the impingement is an aggravation of that bone spur" and that in order to have impingement syndrome Humbert "had to have the bone spur to get there." Relying on *Blake v. Bethlehem Steel Co.,* 225 Md. 196, 170 A.2d 204 (1961), Black and Decker argued that "mere aggravation of a disease not occupational in character is insufficient to establish an occupational disease." *See Blake, supra,* 225 Md. at 200–201, 170 A.2d 204.

In opposition to this first argument, Humbert's attorney contended that the disease at issue was not the preexisting bone spur; instead, the occupational disease was "impingement syndrome." Humbert's attorney relied on the facts as set forth in *Blake* along with a decision by this Court in *Allied–Signal, Inc. v. Bobbitt,* 96 Md.App. 157, 623 A.2d 1311 (1993).

On appeal, both parties rely, at least in part, on *Blake* and both parties make essentially the same arguments as they did below in regard to the first ground Black and Decker raised in support of its motion for judgment.

Medford Blake commenced employment with Bethlehem Steel in 1939. *Blake,* 225 Md. at 198, 170 A.2d 204. At that point he already suffered from, *inter alia,* chronic bronchitis. *Id.* at 197, 170 A.2d 204. At trial Blake's doctor testified:

I think his working conditions aggravated an underlying bronchitis and led to his total permanent disability.... I don't know the etiology of this condition, I am not claiming that his occupation was [the] etiological agent in producing his condition. All I am claiming even as [to] the chronic bronchitis, [is that] repeated exposure in the type [of] work

1. When Black and Decker made its motion for judgment at the conclusion of all the evidence, the trial judge was obliged to consider all the evidence presented together with the inferences that could be reasonably drawn from that evidence, in the light most favorable to Humbert, the non moving party. *See* Md. Rule 2–519(b).

he did in my opinion aggravated his condition and led to worsening and perhaps premature development of total disability.

*Id.* at 198, 170 A.2d 204.

At issue in *Blake* was the construction of Maryland Code (1957), Article 101, section 22(c), which provided:

*Occupational disease aggravating other infirmity or contributing to disability or death from other cause.*—Where an occupational disease is aggravated by any other disease or infirmity, not itself compensable, or where disability or death from any other cause, not itself compensable, is aggravated, prolonged, accelerated or in anywise contributed to by an occupational disease, the percentage of such contribution to be determined by the medical board * * * shall be * * * limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of the disability or death as such occupational disease, as a causative factor, bears to all the causes of such disability or death * * *.

*Id.* at 199, 170 A.2d 204.

The *Blake* Court said:

The appellant argues that an ordinary disease may become occupational where it is aggravated by occupational environment. We think, however, that such a construction would virtually read out of the statute the requirement that in order to support a claim under the language quoted, *there must be a finding that, in part at least, the disability is due to an occupational disease,* and the claim can be allowed only for that part. If the statute is to be broadened in the manner contended for, it should be done by the legislature and not by the courts. The statutes in a few states so provide. *See* 3 Schneider, *Workmen's Compensation,* § 924. Some authors argue for a broad coverage or a broad interpretation. *See* 1 Larson, *Workmen's Compensation Law,* § 41.61. In its first decision the Medical Board made the precise findings that the claimant's condition was "non-occupational in character" and not "characteristic of the

claimant's occupation." Even though Dr. Shiling thought the working conditions aggravated the nonoccupational bronchial condition, we think the end result can not properly be attributed, in whole or in part, to an occupational disease.

*Id.* at 200, 170 A.2d 204 (emphasis added).

In its brief, Black and Decker makes the following argument:

The argument of the injured worker in *Blake* "that an ordinary disease may become occupational where it is aggravated by the occupational environment" is mirrored by the argument that was advanced by [a]ppellee. Both argued that some combination of the underlying pre-existing condition and the work joined to create a compensable occupational disease. If the combination of the two disparate causes could form a compensable situation, then the Court in *Blake* had sufficient evidence to so find. That analysis, however, was rejected by the Court, noting, "[e]ven though [the medical expert] thought the working conditions aggravated the nonoccupational bronchial condition, we think *the end result cannot properly be attributed, in whole or in part, to an occupational disease.*" *Blake*, 225 Md. at 200, 170 A.2d 204.

As can be seen by comparing the statements of the experts in *Blake* and the instant case, the medical facts are quite similar. In both, the injured worker has an underlying condition (here a subacromial bone spur). In both, the work did not cause the development of the underlying condition (note the testimony of Dr. Wittstadt that the cause of the bone spur was not work-related). In both, the medical expert opined that work aggravated the underlying condition. In both, the alleged occupational disease would not have existed but for the underlying condition (again, note the testimony of Dr. Wittstadt that both the subacromial bone spur, or as sometimes noted an anatomical variation, and the alleged repetitive activity were necessary to cause the shoulder impingement syndrome).

The above argument is not persuasive. The disease here at issue is shoulder impingement syndrome or tendonitis. Black and Decker explicitly admits this in its brief at page 17. Unlike the situation in *Blake,* where the claimant suffered from pre-existing chronic bronchitis prior to working for the defendant, here Humbert never had shoulder impingement syndrome prior to working for appellant and, but for the work-related activities (frequent necessity to reach overhead as part of his employment as an electrician), the shoulder impingement syndrome would not have developed—according to Dr. Wittstadt.

Our analysis in the case of *Allied–Signal, Inc. v. Bobbitt, supra,* illustrates the invalidity of appellant's argument. Levon Bobbitt worked for Allied–Signal as an "assembly repair person." 96 Md.App. at 160, 623 A.2d 1311. Her job involved repairing electric units that weighed between fifteen and twenty pounds. *Id.* Her job required her to pick up a unit from a shelf and bring it to her work station. *Id.* When she finished making the repair, she would return the unit to one of four shelves for inspection. *Id.* Two of those shelves were at chest level or higher. *Id.* Ms. Bobbit repaired between three to twenty units per day. *Id.*

After Ms. Bobbitt had worked for her employer for several years, she developed a problem with her left shoulder that her doctor diagnosed as "shoulder impingement syndrome." *Id.* Dr. Ronald Byank, Ms. Bobbitt's expert, testified that the shoulder impingement syndrome was caused by

repetitive activities involving working with the arms, either in front of or in a raised up or overhead type of position. And every time you bring your arm forward, you are pinching the bursa and the rotator cuff between two bony prominences, one being the head of the humerus and the other being the acromion.

And someone who is doing this type of activity in a—on a daily basis frequently is at least predisposed to develop this condition. Not everybody who does this work obviously

gets the condition, but someone who does this type of work is at least a setup to get it.

And somebody who is just doing work sitting at a desk and not doing any work in front of them or over their head generally would not be . . . predisposed or disposed to this.

*Id.* at 161, 623 A.2d 1311.

Dr. Byank also testified that the shoulder impingement syndrome was inherent in the work activities of the claimant. *Id.* He further testified that "with or without the [bone] spur she would have developed the problem anyway." *Id.*

Allied–Signal argued in *Bobbitt* that the trial judge erred in denying its motion for judgment "because there was insufficient evidence to establish that appellee suffered an occupational disease." *Id.* at 164, 623 A.2d 1311. Ms. Bobbitt's employer also argued, as Black and Decker does in the case *sub judice,* that *Blake v. Bethlehem Steel Co., supra,* was controlling. *Id.* at 166, 623 A.2d 1311.

In *Bobbitt,* after reviewing the relevant facts and the decision in *Blake,* we said:

In the case *sub judice,* appellants assert that appellee's pre-existing condition, arthritis, is not characteristic of the industry and was not caused by her occupation. *We note that under the Blake analysis the focus is not whether the pre-existing condition is occupational in character but whether the resulting condition is due, in part at least, to the occupation.* Appellants believe that the existence of the arthritis precludes a finding of an occupational disease because the resulting condition, shoulder impingement syndrome, was due to the aggravation of the arthritic condition. Although there is evidence that supports this argument, we must view the evidence in the light most favorable to appellee.

Dr. Byank testified that the working conditions of appellee possibly contributed to her arthritis; however, he specifically stated that with or without the arthritis, appellee would have developed this condition. He further stated that the shoulder impingement syndrome resulted from the re-

petitive activities inherent in her work; "you can not separate the condition from the work. . . ." *This testimony establishes that even if the arthritis effected [sic] the development of the shoulder condition, the condition was due in part to the characteristics of appellee's employment.* Because this testimony contradicts the testimony of Dr. Cohen, a jury question was raised concerning whether this shoulder impingement syndrome was occupation in character. Thus, the lower court did not err in submitting this case to the jury.

*Id.* at 167–68, 623 A.2d 1311 (emphasis added).

█ As can be seen from the portion of the *Bobbitt* opinion that we have emphasized, the focus that the court should apply is to the issue of whether the resulting condition (shoulder impingement syndrome) is due, in part, to the occupation. With that focus in mind, it is clear, based on Dr. Wittstadt's testimony, that Humbert's shoulder impingement syndrome resulted, in part, from the repetitive overhead activities inherent in his work as an electrician.

Black and Decker argues that the "salient fact in *Bobbitt* was that the occupational disease would have happened whether the underlying condition existed or not," whereas in the case at hand, the facts "differ[ ] dramatically" because Dr. Wittstadt testified that the occupational disease (shoulder impingement syndrome) would not have existed but for the pre-existing bone spur.

Appellant's "salient fact" argument is in no way persuasive in light of the fact that the *Bobbitt* Court clearly stated that even if the arthritis did contribute to Bobbitt's condition it still would have been compensable so long as the resulting condition (impingement syndrome) "is due, in part at least, to the occupation." *Id.* at 167, 623 A.2d 1311.

After attempting to distinguish *Bobbitt,* Black & Decker argues, in the alternative, that the language from *Bobbitt* that is quoted above is not binding because it amounted to mere *dicta.* In *Bobbitt,* the issues presented were:

I. Did the court err in excluding the designated represen-
tative of the employer/insurer pursuant to its sequestra-
tion order?

II. Did the court err in submitting the case to the jury
when there was legally insufficient evidence to estab-
lish a claim for an occupational disease?

*Id.* at 159, 623 A.2d 1311.

The *Bobbitt* Court answered the second question in the
negative and the first in the affirmative. The excerpts from
*Bobbitt* relied upon by Humbert were all part of the court's
discussion necessary to the resolution of the second question.
And, if the second question had been answered in the affirma-
tive it would not have been necessary to answer the first
question. Thus, no part of the *Bobbitt* discussion relevant to
this case was *dicta.*

 A second reason that appellant gave in the trial court
in support of its motion for judgment was that Humbert failed
"to present competent evidence that it's the nature of an
electrician that he's going to get shoulder impingement syn-
drome." Black and Decker's argument at trial continued
"regardless of whether Humbert got it because of his job, it's
not due to the inherent nature of the general class of occupa-
tion." Black and Decker cited below, and cites in this Court,
three cases in support of its position, viz.: *King v. Bd. of
Educ.,* 354 Md. 369, 731 A.2d 460 (1999); *Means v. Baltimore
County,* 344 Md. 661, 689 A.2d 1238 (1997); and *Davis v.
Dynacorp,* 336 Md. 226, 647 A.2d 446 (1994).

An occupational disease has been defined as:

some ailment, disorder, or illness which is the expectable
result of working under conditions naturally inherent in the
employment and inseparable therefrom, and is ordinarily
slow and insidious in its approach.

*Foble v. Knefely,* 176 Md. 474, 486, 6 A.2d 48 (1939). *See also
Allied–Signal, Inc. supra,* 96 Md.App. at 166, 623 A.2d 1311,
which cited *Foble.*

Black and Decker argues:

In the present case, Appellee presented no evidence that impingement syndrome of the right shoulder is a hazard due to the general character of the work of an electrician. Specifically, Appellee presented no evidence by a qualified expert in this regard. The only expert presented by Appellee was a medical expert, Dr. Wittstadt. Appellee's expert specifically stated that his opinion concerning the cause of Appellee's shoulder impingement syndrome came from the specific job duties as described by Appellee.

Appellants made clear that the Appellee's medical expert was not an ergonomist. There were no studies or evidence demonstrating that there is a plethora of claims from electricians for impingement syndrome of their shoulders. The only evidence with regard to the cause for impingement syndrome of the shoulder had to do with the specific job requirements of Appellee, which under the case law is not sufficient.

It is true that no ergonomist testified in the case *sub judice,* nor was there evidence presented showing that there existed "a plethora of claims from electricians for impingement syndrome of their shoulders." But Humbert testified that he had been an electrician for twenty-five years, and that the overhead activities in which he engaged (working on the lights in the ceilings, and similar work as an electrician that required over-head reaching) constituted "job duties typical of all the electricians ..." that he had observed during his years in the profession. That testimony, if credited by the jury, was sufficient to show that repeated over-the-head arm movements were required for an electrician to perform his or her job.

■ We disagree with appellant's contention that the "only evidence with regards to the cause for impingement syndrome of the shoulder had to do with the specific job requirements of [a]ppellee." Humbert's testimony was that the job requirements of an electrician made it necessary to have repeated overhead arm motions; moreover, Dr. Wittstadt testified that such motions, when coupled with the pre-existing bone spur, were the cause for the impingement syndrome.

■ A "hazard" is defined as "a chance of being injured or harmed; danger." *American Heritage College Dictionary* 624 (3d ed.1997). In other words, a hazard is a risk factor. To be compensable, it is the risk factors, not the disease, that must inhere in the nature of the employment. Taking the evidence in the light most favorable to Humbert, one of the risk factors of being an electrician is developing impingement syndrome due to the necessity of reaching above one's head repeatedly.

None of the three cases relied upon by Black and Decker supported its contention that it was entitled to the grant of a motion for judgment. In *Davis v. Dynacorp*, 336 Md. 226, 647 A.2d 446 (1994), the claimant was a computer operator who developed post-traumatic stress disorder (PTSD) as a result of acts of harassment directed at him by his co-workers. *Id.* at 227–28, 647 A.2d 446. The issue in *Davis* was whether the PTSD suffered by the claimant was "due to the nature of an employment in which hazards of an occupational disease exist." *See* Labor and Employment Article, section 9–502(d)(1)(i). The Court of Appeals answered that question in the negative, and explained:

> Davis was employed as a computer operator, which entailed, among other tasks, the entry of data. According to Davis, he spent about 80% of his day entering data, and the other 20% of the day preparing paperwork, answering the telephone, and reading manuals and other publications. We agree with the circuit court's observation that "harassment by fellow employees is not a hazard within the nature of the employment of a computer data operator...." We see nothing peculiar to Davis's duties as a computer operator that made him more susceptible to harassment than in any other kind of employment. We note that the legislative emphasis on the relationship between a particular disease and a particular type of employment was certainly evident in the original workers' compensation legislation. For instance, adjacent to the column of diseases was a column describing the type of employment within which the disease might be contracted. *See* Ch. 465 of the Acts of 1939,

§ 32A, at 992–95 (describing, for example, that "anthrax" was associated with "handling of wool, hair, bristles, hides or skins"). Although the specific diseases and employment descriptions have been eliminated, the necessity of a relationship between the particular disease and the "nature" of one's employment still exists. In the instant case, there simply is not the requisite relationship between the nature of Davis's work and the "disease" that he allegedly sustained.

*Id.* at 237–38, 647 A.2d 446.

In contrast to *Davis,* the evidence in this case showed that there were activities peculiar to Humbert's duties as an electrician (repeated necessity to reach overhead) that made him more susceptible to shoulder impingement syndrome than in other types of employment.

In *Means v. Baltimore County,* 344 Md. 661, 689 A.2d 1238 (1997), the claimant, Doreen Means, was a paramedic whose job required her to respond to emergency calls and to render aid at the scenes of accidents and other emergencies. *Id.* at 662, 689 A.2d 1238. About one year after Means commenced employment, she responded to the scene of a severe accident in which five teenagers died. *Id.* A few days later, claimant responded to another emergency call. *Id.* At the scene of that accident there were fatalities and serious injuries equal to those suffered by the teenagers who were killed one week earlier. *Id.*

About five years later, in 1992, Means was required to provide paramedic services to victims of a motorcycle accident in which the victim's scalp had been torn away from his skull. *Id.* at 663, 689 A.2d 1238. After the accident, Means testified that she "woke up" and remembered the particular traumatic accidents that had occurred five years previously. *Id.* Approximately four months after the 1992 accident, Means was diagnosed with PTSD. *Id.*

Means brought a workers' compensation claim based on the PTSD diagnosis, but the Commission concluded that she had not suffered an occupational disease. *Id.* at 664, 689 A.2d

1238. The claimant filed a petition for judicial review in the Circuit Court for Baltimore County. *Id.* The circuit court granted the employer's motion for summary judgment on the grounds that, as a matter of law, PTSD may not form the basis of an occupational disease claim. *Id.* at 664, 689 A.2d 1238. The Court of Appeals granted *certiorari* before consideration of the issue by this Court and thereafter reversed the judgment. *Id.*

In *Means,* the Court of Appeals distinguished its holding in *Davis,* as follows: "unlike the occupation of computer operator in *Davis,* the occupation of paramedic is 'an employment in which hazards of the occupational disease exist.' " [ (citing section 9–502(d)(1)(i) of the Labor and Employment Article.) ] *Id.* at 670, 689 A.2d 1238. In the course of the *Means* opinion, the Court concluded that Ms. Means

> asserted PTSD may be reasonably characterized as due to the general character of her employment as a paramedic. Unlike the computer operator in *Davis* who divided his time between programming computers and reading manuals, Means's employment as a paramedic exposed her to events that could potentially cause PTSD.

*Id.* at 671, 689 A.2d 1238 (footnotes omitted).

It is important to note that in reaching its decision the *Means* Court focused upon whether the hazards leading to the development of the employee's illness were in the nature of her employment, not whether her illness was an inherent risk of her employment.

*King v. Bd. of Educ.,* 354 Md. 369, 731 A.2d 460 (1999), concerned a claimant who was employed by the Prince George's County Board of Education. *Id.* at 371, 731 A.2d 460. Starting in 1983 and for the next twelve years, the claimant received a series of promotions, and by July 1995 held the position of transportation management analyst. *Id.* The claimant testified that besides performing her duties as a transportation management analyst she also performed the job of two other people, i.e., transportation technician and transportation assistant. *Id.* In September of 1995, a psychia-

trist diagnosed the claimant as suffering from somatization disorder and major depression.[2] *Id.* at 372, 731 A.2d 460. The claimant's symptoms included nausea, vomiting, diarrhea, chest pains, headaches, pain in her abdomen and hip, loss of libido, balance problems, verbal confusion, and unsteadiness on her feet. *Id.* In *King*, the claimant filed a claim with the Commission alleging that she suffered from an occupational disease. Id. The Commission ruled against the claimant, who then filed a petition for judicial review in the Circuit Court for Prince George's County. *Id.* The employer responded by filing a motion for summary judgment. *Id.* at 372–73, 731 A.2d 460. In her opposition, the claimant argued that her job put her under tremendous stress as a result of "several years of excessively long and stressful workdays," during which she was "consistently required to remain at work for twelve or more hours each day," and after work, "frequently found it necessary to spend several more hours each night in her home on work-related tasks." *Id.* at 373, 731 A.2d 460.

In *King*, the Court affirmed the circuit court's grant of summary judgment, explaining:

Though we did not have occasion in either *Davis* or *Means* to consider whether mental occupational disease claims and physical occupational disease claims are analyzed under an identical framework, we made clear that mental disease claims must, at a minimum, satisfy those standards applicable to physical claims. Every occupational disease claim, whether mental or physical, must satisfy the statutory standard of § 9–502(d)(1)(i), *i.e.*, the alleged disease must be "due to the nature of an employment in which hazards of the occupational disease exist."

---

**2.** Footnote 1 of the *King* decision reads as follows:

According to the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV), "the essential feature of Somatization Disorder is a pattern of recurring, multiple, clinically significant somatic complaints.... The multiple somatic complaints cannot be fully explained by any known general medical condition or the direct effects of a substance." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 446 (1994). *Id.* at 372 n. 1, 731 A.2d 460.

King can not satisfy this threshold requirement. Her evidence and arguments before both the Commission and the circuit court indicate that she was an overworked employee in a mismanaged position. She presented no direct evidence that the stress-related illnesses of somatization disorder and/or major depression were somehow inherent in the nature of the position of transportation assistant. Nor did she present evidence that these illnesses would not occur in equal frequency in any other occupation in which employees were overworked and/or mismanaged.

Instead of presenting evidence of the hazards inherent in the occupation of transportation assistant, King presented evidence of the hazards in her specific job. Such evidence is consistent with her claim that when the Legislature used the phrase "due to the nature of an employment in which hazards of the occupational disease exist," it intended to equate "employment" with a specific job. This argument is contrary to Maryland law. "Employment" in the context of § 9–502(d)(1)(i) does not mean the specific job in which the person is working; it means the profession or general occupation in which the person is engaged.

*Id.* at 381–82, 731 A.2d 460 (citations omitted).

From the above cases, it is clear that in applying section 9–502(d)(1)(i) the Court must examine the duties of a claimant's profession to determine if the hazard that led to the disease exists in the nature of that employment. In this case, appellee met that threshold requirement by introducing evidence that showed: 1) overhead reaching is a regular part of an electrician's job, and 2) repeated overhead reaching is a risk factor for developing shoulder impingement syndrome.

For all the above reasons, we hold that the trial judge did not err in denying Black and Decker's motion for judgment.

## B. The Jury Instructions

At the conclusion of the case, the trial judge, insofar as is here relevant, instructed the jury as follows:

Now, an occupational disease is a disease contracted by a covered employee as a result of and in the course of employment and that caused the covered employee to become temporarily or permanently, partially or totally incapacitated. It may also be defined as some ailment, disorder or illness, whether physical or psychiatric, which is the expected result of working under conditions *naturally inherent in the employment and inseparable therefrom.*

For an occupational disease to be compensable, it must result in whole or in part *from the nature of the claimant's employment in general.*

(Emphasis added.)

\*　　\*　　\*

In this appeal, Black and Decker argues:

Basically, the error with regard to the jury instructions presented by the Court has to do with the failure to instruct the jury as requested by Appellants. Three special instructions requested by Appellants properly identified the law applicable in this matter. First, Employer and Insurer's Request for Jury Instruction No. 3 properly sets forth the requirement under *King, Means* and *Davis* that the term employment, as used in *Labor & Employment Article,* § 9–502(d)(1)(i), means the general nature of the employment and not the specific job or duties performed by Appellee. *See also, Smith v. Howard County,* 177 Md.App. 327, 935 A.2d 450 (2007). In lieu of this, the Court presented the law in terms proposed by Appellee, without delineating the legal requirements for the term employment. Absent a proper identification of this term (employment), the Court allowed the jury to consider and Appellee *to argue that it was the activities of his job and how he did it that could be sufficient to demonstrate the compensability of the alleged occupational disease.*

(Emphasis added.)

Appellant's proposed jury instruction No. 3 read as follows:

For an occupational disease to be compensable, it is not sufficient for the condition to merely result from the em-

ployment in which the Claimant was engaged at the time. *Instead, the occupational disease that is alleged must be due to the nature of the[sic] of an employment in general* in which the hazards of the occupational disease exist. Employment in this context does not mean the specific job in which the Claimant was working; it means the profession or general occupation in which the Claimant is engaged.

(Emphasis added.)

The court declined to give proposed instructions *verbatim* for the following reasons:

The problem I have with that, it's an argumentative instruction because when you start with it's not sufficient for the Commission, instead it must be, it's like it doesn't say what it is; it says what it isn't. And you agreed to do over the top of that.

█ Although the trial court did not parrot exactly what Black and Decker suggested, it did adopt, in substance, the following sentence from defendant's suggested instruction No. 3, viz.: "the occupational disease that is alleged must be due to the nature of the ... employment in general." The problem is, as appellant suggests, the instruction as given did not make it clear that to be compensable the injury must be a hazard of the claimant's profession (electrician) and not a hazard of the particular job or jobs the claimant happened to be performing for Black and Decker. Because of that ambiguity, we agree with appellant that the court erred in not giving defendant's proposed instruction No. 3. But in a civil case, to be successful on appeal, an appellant must do more than demonstrate that the trial judge erred. The appellant must also demonstrate that the error was prejudicial. *See Flores v. Bell*, 398 Md. 27, 33–34, 919 A.2d 716 (2007); *Crane v. Dunn*, 382 Md. 83, 91–92, 854 A.2d 1180 (2004).

Appellant asserts that the error was prejudicial because the court's instruction allowed appellee's counsel "to argue that it was the activities of his job and how [appellee] did it that could be sufficient to demonstrate the compensability of the alleged occupational disease." Humbert disputes the factual predicate

for this argument. Appellee maintains that his counsel "never argued to the jury that the activities of the specific job were sufficient for compensability" but instead argued "that the job duties that constitute the hazards of the occupational disease must not only be present in a claimant's particular employment, but must also be part of the nature of the profession in general." It is impossible for us to know with certainty what counsel argued because the closing arguments were not transcribed. Nevertheless, based on what appellee's counsel proved at trial and what his counsel argued in opposition to appellant's motion for judgment, it appears likely that appellee's counsel's recollection as to what he said in closing argument is accurate because what he claims to have argued is entirely consistent with what was argued in every part of the record that was transcribed. For the above reason, we hold that appellant has failed to demonstrate prejudice due to the court's failure to give proposed instruction No. 3.

■ Black and Decker next argues that the trial judge erred in failing to give its proposed instruction No. 4, which read as follows:

The mere aggravation of a condition that is itself not occupational in character is insufficient to render the resulting condition an occupational disease.

When jury instructions were discussed on the record with counsel prior to the court giving its instructions, appellant's counsel made no mention of proposed instruction No. 4. More important, at the conclusion of the judge's instructions, appellant's counsel did not object to the failure to give instruction No. 4, nor can any of the words used by defense counsel in objecting to the instructions be construed as informally making such an objection.[3] Therefore, the issue of whether the

---

**3.** The only objection made to any instruction was phrased by appellant's counsel as follows:

As previously stated, this whole question of "in whole" or "in part" concept, that only goes to one type. 9–502(d)(1) requires a hazard being inherent to the disease. Instructions coming from the type of work, by not having an explanation of the word employment—I

trial judge should have given proposed instruction No. 4 is waived. *See* Md. Rule 2–520(e).[4]

Lastly, appellant contends that the trial judge erred in failing to give its proposed jury instruction No. 5. That proposed instruction read:

> Instead of a mere aggravation of a prior condition that itself is not occupational in character an occupational disease requires that the work of the Claimant alone could have caused the development of the occupational disease.

Proposed instruction No. 5 was not mentioned in the colloquy with the judge that preceded the giving of the instructions. Moreover, at the conclusion of the judge's instructions, Black and Decker's counsel did not object to the failure to give that instruction. Accordingly, the issue as to whether proposed instruction No. 5 should have been given is waived. *See* Md. Rule 2–520(e).

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

forget which instruction it is. I think it's the one before proof of injury where it defines occupational disease.

It doesn't define employment specifically which is kind of weird because it has to be general employment, not the work Mr. Humbert did. So plaintiff's claim as instructed, which was adopted, is in error. Proof of injury is in error when it's in whole or in part. It's the combination of the two, not just them separately.

4. Md. Rule 2–520(e) reads as follows:

*Objections.* No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury.