*Baltimore County, Maryland v. Michael Quinlan*, No. 50, September Term, 2018, Opinion by Adkins, J.

**MARYLAND WORKERS' COMPENSATION ACT—OCCUPATIONAL DISEASE—LE § 9-502(D)—PARAMEDIC/FIREFIGHTERS—DEGENERATIVE MENISCAL TEARS**: Pursuant to Maryland Code Ann. (1991, 2016 Repl. Vol.), § 9-502(d) of the Labor and Employment Article ("LE"), an occupational disease is only compensable if: (1) it is "due to the nature of an employment in which hazards of the occupational disease exist"; and (2) "it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee." Here, the record contained evidence that the nature of the job of a paramedic/firefighter involved hazards that place an employee at greater risk for degenerative knee conditions than those faced by the general public. The employee, Michael Quinlan ("Quinlan"), was a paramedic, and was required to engage in the activities that account for this increased risk. Moreover, he engaged in these activities repetitively over 24 years of employment. This claim was not shown to involve a concomitant preexisting condition. Therefore, as a matter of law, the degenerative meniscal tears could be considered an occupational disease, and there was sufficient evidence for the jury to reasonably conclude that Quinlan's degenerative knee tears were compensable.

Circuit Court for Baltimore County
Case No. 03-C-16-004811
Argued: February 5, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 50

September Term, 2018

BALTIMORE COUNTY, MARYLAND

v.

MICHAEL QUINLAN

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty,
Adkins, Sally D.,
   (Senior Judge, Specially Assigned)

JJ.

Opinion by Adkins, J.
Getty, J., dissents.

Filed: August 26, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"Definitions of 'occupational disease' should always be checked against the purpose for which they were uttered." Arthur Larson, Lex K. Larson & Thomas A. Robinson, 4 *Larson's Workers' Compensation Law* § 52.03[1] (Matthew Bender, Rev. Ed. 2019). The purposes of Maryland's Workers' Compensation Act are manifold and, like others, involve a recognition of the many competing interests—"to protect capital and labor, employer and employee, and the State against the waste and distress incident to modern industry . . . ." *Liggett & Meyers Tobacco Co. v. Goslin*, 163 Md. 74, 80 (1932). Still, we bear in mind the sacrifice and special toll certain Maryland workers withstand in the course of their service.

The present case involves the claim of a veteran paramedic/firefighter regarding degenerative meniscal tears in his right knee. We review two questions, which we have rephrased and consolidated from the questions granted[1] for clarity. First, we review

---

[1] The questions, as granted, were as follows:

> (1) Did the trial court err in denying Petitioner's motion for summary judgment, given the lack of a clearly defined occupational disease as the basis for the claim and evidence that the conditions were shown to be prevalent in all occupations involving heavy physical labor not uniquely related to the work of a paramedic or EMT as an inherent and inseparable risk?

> (2) Did CSA err in finding that Respondent met the statutory requirements set forth in LE § 9-502(d)(1) and that he had sufficiently established at trial that his condition resulted from an inherent hazard of his employment as a paramedic or EMT?

> (3) Should this Court review the decision below under the statutory requirements and existing case law, particularly *Black and Decker Corporation v. Humbert*, 189 Md. App. 171

whether the trial court erred in denying the County's motion for summary judgment, and, if not, whether the trial court erred in finding that Quinlan met the statutory requirements set forth in LE § 9-502(d)(1) that his alleged occupational disease was "due to the nature of an employment in which hazards of the occupational disease exist . . . ." We conclude that the trial court did not abuse its discretion by denying the motion for summary judgment; nor did it err in concluding that Quinlan's degenerative meniscal tears could be classified as an occupational disease.

## FACTUAL OVERVIEW AND PROCEDURAL POSTURE

In October 2015, Michael Quinlan ("Quinlan") filed a claim with the Workers' Compensation Commission ("the Commission") against his employer, Baltimore County ("the County"). In it, he asserted that he "developed meniscal tears" in his right knee due to his job duties as a "Paramedic/Firefighter."[2] The Commission held a hearing regarding Quinlan's claims and evaluated, among other things, whether he "sustain[ed] an occupational disease arising out of and in the course of his employment[.]" Ultimately, the Commission disallowed the claim, concluding that Quinlan "did not sustain an

---

(2009), which similarly ignores the legislative requirement that a disease is only occupational if it is "due to the nature of an employment in which the hazards of the occupational disease exist" (LE § 9-502(d)(1)(i)), to provide clarification and guidance on the requirement for establishing a legally sufficient claim for occupational disease?

[2] Quinlan described his occupation as consisting of 95% paramedic duties, as opposed to those of a firefighter. Thus, we will refer to him as a paramedic throughout this opinion.

2

occupational disease of the [r]ight [k]nee degenerative tears arising out [of] and in the course of" his employment.

Quinlan then sought review in the Circuit Court for Baltimore County, requesting a jury trial. In appeals from the Commission, the trial court's role is to determine whether the Commission "justly considered all of the facts," "exceeded the powers granted to it," or "misconstrued the law and facts applicable in the case decided." Md. Code Ann. (1991, 2016 Repl. Vol.), § 9-745(c)(1)–(3) of the Labor and Employment Article ("LE"). The Commission's decision is presumed "*prima facie* correct" and the party challenging the decision has the burden of proof. *Id.* § 9-745(b)(1)–(2).

Prior to trial, the County filed a motion for summary judgment arguing that Quinlan failed to present evidence that his knee injury was an occupational disease or that it was related to the nature of his employment as a paramedic. Quinlan opposed this motion. Based on the parties' competing submissions, the trial judge denied the County's motion for summary judgment concluding that there was "absolutely a material dispute of fact."

The case proceeded to trial on April 19 and 20, 2017. Quinlan, 51 years old at the time, testified first. He began by describing his occupation and the general duties thereof. Over the course of his career, he had served 29 years as a paramedic, the last 24 with Baltimore County. Typically, his schedule consisted of two 10-hour days of work, followed by two 14-hour nights, and four days off. During these four-day shifts, he stated, paramedics generally "run" 26–30 calls, which last 1–2 hours each. Quinlan also described the activities undertaken on a "typical" emergency call that might impact his right knee, including: climbing in and out of emergency vehicles, carrying up to 50 pounds of gear,

3

crouching to address and service patients, administering compressions or other aid, lifting patients onto stretchers and moving stretchers, and taking patients up and down stairs.[3] He also stated that he is "right dominant," meaning he uses his right leg more often during the above tasks.

Quinlan testified that he started experiencing pain and "clicking" in his right knee in 2014, causing him to seek out a doctor. Although he had seen a doctor in 2005 regarding a knee injury, he did not necessarily see the two phenomena as related. Ultimately, Quinlan underwent surgery to repair his meniscal tears.

The parties each introduced the same experts before the trial court as they had used before the Commission. Quinlan presented a video deposition of Barbara A. Cochran, M.D. ("Cochran"), a physician with specialties in internal, occupational, psychiatric, and pulmonary medicine. Cochran's testimony was based on her research, her review of Quinlan's medical records, and her phone examination of Quinlan, although she never physically examined him. Cochran said that Quinlan had a tear in both his medial and lateral menisci. These tears "extend[ed] to the articular surface of the tibia," which Cochran identified as important because that "is where the bones come together" which can lead to osteoarthritis.

Cochran described Quinlan's meniscal tears as "part of the continuum of osteoarthritis." Accordingly, she focused on repetitive use as the primary risk factor for

---

[3] In addition to his paramedic duties, Quinlan also testified that he had been a competitive bench press weightlifter, and that he golfed, sometimes sailed, and lived in a home with stairs.

his knee issues. She explained that repetitively using a knee with meniscal tears can lead to osteoarthritis because such use leads to inflammation in the joint that is not healed before its next use. She described this process as a cycle of inflammation, followed by partial healing, followed by inflammation, and so on. Alternatively, the osteoarthritis can contribute to degeneration and tears in the meniscus in a similar manner. She also addressed other risk factors for degenerative knee issues, such as gender, age, weight, genetics, and prior injury. Quinlan was five feet and nine inches tall and weighed approximately 235 pounds. Cochran stated that gender, age, and weight were unlikely to be the primary factors here because Quinlan's knee damage was confined to his right knee. Moreover, she opined that Quinlan's 2005 knee injury likely had no relation to his osteoarthritis based on the symptoms and complaints he presented at the time of his injury. She did not have enough information to address genetics.

Cochran also testified about the relationship between Quinlan's degenerative knee tears and his occupation as a paramedic. Specifically, she pointed to a study that concluded that paramedic/firefighters have a "relative risk" of developing knee osteoarthritis of 2.93 compared to the general population, meaning that there are 293 cases of degenerative knee tears in paramedic/firefighters for every 100 cases in the general population. Based on this study and her examinations, she concluded that Quinlan's "essential job functions . . . which include considerable repetitive kneeling, bending, [and] stress on the knee, [were] the cause of his knee osteoarthritis."

Next, the County introduced the video deposition of its expert witness, Richard Hinton, M.D. ("Hinton"), a specialist in orthopedic surgery. Hinton had examined Quinlan

5

and explained that his knee tears were classified as "complex," meaning that they could be wholly degenerative or acute tears that degenerated over time. Still, he opined that Quinlan's other risk factors for knee problems, such as weight and age, were the primary causes of his degenerative knee tears, not his occupation. Specifically, he stated that the "primary or direct cause of [Quinlan's] meniscus issues"—which Hinton believed contributed to the osteoarthritis—were not "his duties as a firefighter and EMT."

During his physical examination of Quinlan and in making his report, Hinton did not know that Quinlan had sustained an on-the-job acute injury to his knee in 2005. Upon learning of this fact during his deposition, Hinton stated that his "occupational injury . . . could contribute to long-term knee problems." He later opined that, although Quinlan's job was not the "primary cause" of his knee problems, it was a "potential" or "arguable" cause of them. He also recognized that "there is literature to suggest that people who are in firefighter or EMT positions have higher rates of both meniscus tears and of arthritis, as do people in many physically demanding jobs."

The jury returned a verdict for Quinlan, stating that he had "sustain[ed] an occupational disease of right knee degenerative tears of the . . . medial and lateral menisci . . . arising out of and in the course of his employment[.]" During the County's appeal, the Court of Special Appeals ruled that "Quinlan met the statutory requirements of LE § 9-502(d)(1) by establishing at trial that the degenerative menisci tears were an occupational disease . . . ." *Balt. Cty. v. Quinlan*, 238 Md. App. 486, 509 (2018). Moreover, it said, Quinlan successfully established that "repetitive kneeling and squatting"

6

are: (1) "a regular part of a paramedic's job," and (2) "a risk factor for developing menisci tears . . . ." *Id.* We granted the County's petition for writ of *certiorari*.

## DISCUSSION

### Denial of Summary Judgment Motion

We first address the trial court's denial of the County's motion for summary judgment. The County argues that the trial court erred in denying its motion for summary judgment because Quinlan's initial Employee Claim Form listed the occupational disease as "meniscal tears," but the evidence and testimony at trial involved "degenerative meniscal tears," which includes the osteoarthritis. The County argues that by "extract[ing]" the meniscal tear claim and excluding any reference to the osteoarthritis, Quinlan avoids "any argument or burden of proof that inter-related conditions, such as 'osteoarthritis,' exist and affect the same body part," and also that the osteoarthritis was in the "nature" of the employment. The County asserts that "[t]he claimant should not be able to avoid its burden by choosing only a portion of the overall ailment" for the claim, thereby avoiding the "burden of proof as to the entire disorder . . . ." Quinlan states that denial of the motion for summary judgment was proper because there was a dispute of material fact as to the cause of the meniscal tears and the "incidence of meniscal tears" in his work as a paramedic.

Typically, we review the denial of a motion for summary judgment for abuse of discretion. *See Hous. Auth. of Balt. City v. Woodland*, 438 Md. 415, 426 (2014). There are occasions in which the appellate court reviews non-discretionary matters without deference to the trial court, even on denials of summary judgment. *See Presbyterian Univ.*

7

*Hosp. v. Wilson*, 337 Md. 541, 549 (1995) (stating that "to the extent that the issue of personal jurisdiction [was] a question of law, it is not properly submitted to the trier of fact to resolve," and, therefore, there was "nothing to preclude our review of this issue"). Even so, in the interest of "promot[ing] justice," the trial court ordinarily "possess[es] discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits; and this discretion exists even though the technical requirements for the entry of such a judgment have been met." *Metro. Mortg. Fund, Inc. v. Basiliko*, 288 Md. 25, 28 (1980) (citations omitted). Such is the case here, so we review the trial court's ruling for abuse of discretion.

Before the trial began, the County filed a motion for summary judgment. In it, the County characterized Quinlan's claim as one for "an unknown, unnamed, degenerative disease involving his right knee," which was alleged to have resulted from his work as a paramedic/firefighter. The County asserted that Quinlan "provided no evidence" regarding: (1) the occupational disease he suffered from; or (2) the disease's relation to the "nature of his employment" and not some intervening factor. It also submitted Hinton's medical examination report. Thus, it averred, the County was entitled to summary judgment as a matter of law.

In response, Quinlan reasserted his claim that he had sustained "an occupational disease of degenerative tears of the posterior horns of both the medial and lateral menisci of his right knee." He recounted the duties he undertook as a paramedic that caused the knee condition, including: lifting patients onto stretchers, kneeling to assess patients, and sometimes carrying patients. These activities occurred consistently over his 26–30

8

emergency calls for each four-day shift. He also points to Cochran's testimony asserting a causal link between "the meniscal tears and pathology" and Quinlan's "essential job functions as a firefighter/EMT."

The trial court denied the County's motion for summary judgment, concluding that there was "absolutely a material dispute of fact." While the County states that Quinlan did not claim that the meniscal tears were degenerative, the County described the tears as degenerative in its own motion for summary judgment. It is plain that Quinlan had provided evidence regarding his alleged occupational disease and its relation to his employment in the form of the "Independent Medical Opinion and Causation Analysis" from Cochran, submitted to the Commission as part of his initial claim. To the extent that Quinlan had yet to provide evidence that meniscal tears and knee degeneration were within the "continuum of osteoarthritis," the trial court still maintained discretion to "affirmatively . . . deny[] a summary judgment request in favor of a full hearing on the merits . . . ." *Basiliko*, 288 Md. at 28. The trial court was well within its discretion to deny the motion for summary judgment at this stage.

## Occupational Disease

### *Preservation of "Sufficiency" Argument*

Quinlan argues that the County failed to preserve any argument regarding the sufficiency of the evidence by failing to make a motion for judgment pursuant to Maryland Rule 2-519. The consequence of failing to make a motion for judgment is that the party claiming insufficiency of evidence fails to preserve that issue for appeal. *See, e.g.*, *Barnes v. Greater Balt. Med. Ctr., Inc.*, 210 Md. App. 457, 487 (2013) ("We decline to discuss

9

this issue because GBMC did not raise this issue in its motions for judgment. Instead, it was only raised in the motion for JNOV."); *Kent Village Assocs. Joint Venture v. Smith*, 104 Md. App. 507, 516–17 (1995) (applying Rule 2-519 to exclude appellate issue when argument on motion for judgment as too general).

Assuming without deciding that Maryland Rule 2-519 applies in a jury trial that is part of an appeal to the circuit court from a decision of the Commission, we nonetheless decline to decide this preservation issue. First, Quinlan failed to raise this preservation issue in the Court of Special Appeals. *See Scott v. State*, 454 Md. 146, 188 (2017) ("[T]o preserve an issue for this Court's review, a party must raise the issue in the Court of Special Appeals if the case came before that Court."). Moreover, the arguments made by the County in its brief are largely a bid for the Court to set limitations on what is considered an "occupational disease" within the meaning of LE § 9-502, which involves important legal issues that go well beyond sufficiency of the evidence in this case. Finally, in the course of addressing the material legal arguments made by the County on appeal, Quinlan prevails. Thus, any issue about preservation of the County's sufficiency of the evidence argument becomes moot. *See generally* Md. Rule 8-131.

*Compensability Under LE § 9-502(d)*

The parties' principal disagreement centers around whether degenerative meniscal tears were both "caused" by Quinlan's occupation as a paramedic and "due to the nature of an employment in which hazards of the occupational disease exist," pursuant to LE § 9-502(d). In interpreting a statute, our overarching objective is to "ascertain and effectuate" the legislative intent underlying it. *Shah v. Howard Cty.*, 337 Md. 248, 254 (1995) (citation

10

omitted). "The primary source from which to determine legislative intent is the plain meaning of the statutory language." *Uninsured Emp'rs Fund v. Danner*, 388 Md. 649, 659 (2005) (citation omitted). Indeed, "[t]he language of a statute is its most natural expositor, and, where the language is susceptible of a sensible interpretation, it is not to be controlled by any extraneous considerations." *Victory Sparkler & Specialty Co. v. Francks*, 147 Md. 368, 378 (1925) (citation omitted). We generally endeavor to interpret the provisions of the Workers' Compensation Act, "liberally, where possible, in order to effectuate the broad remedial purpose of the statutory scheme." *Danner*, 388 Md. at 659.

In workers' compensation cases, "[a]ppeals to the appellate courts are limited strictly to issues of law. . . . [Appellate courts] decide whether the trial court has correctly determined the appeal from the Commission." Richard P. Gilbert, et al., *Maryland Workers' Compensation Handbook* § 16.08, at 16-16 (4th ed. 2013). Therefore, rather than reviewing the factual determinations of the Commission or a circuit court, "to which we would owe deference," *Pro-Football, Inc. v. McCants*, 428 Md. 270, 282 (2012), we review the conclusions of law regarding the construction and application of LE § 9-502(d).

The County argues that the Circuit Court decision was based on an erroneous construction of the Workers' Compensation Act, contrary to the plain language of LE § 9-502. This is especially so, it states, because the Commission's decision is entitled to a presumption of *prima facie* correctness. The County describes the case as involving two distinct questions of law: (1) "whether the specific characterization of the claim was legally sufficient as an occupational disease under LE § 9-502"; and (2) "whether the condition described as 'degenerative tears of the posterior horn of both the medial and lateral

11

meniscus' can qualify as a matter of law as an occupational disease for a Paramedic/Firefighter."

Regarding the first question, the County maintains that Quinlan's characterization of his occupational disease on the initial Claim Form was not legally sufficient. Quinlan, it argues, is attempting to advance an osteoarthritis claim, as well as a meniscal tears claim. Yet, it states that Quinlan never included osteoarthritis in a description of occupational disease, so it should not have been considered by the trial court. As to the second question, the County argues that there are "no inseparable and unavoidable characteristics of the job duties and responsibilities that have been shown to result in 'degenerative meniscal tears of the right knee' as the 'natural and expected result' of [Quinlan's] occupation." Pointing to multiple previous Maryland cases, it states that the present claim lacks a "distinctive employment hazard" associated with Quinlan's job. The County also warns that Quinlan's argument will result in preexisting conditions no longer being a defense or deduction for employers, but now being a "bonus" for employees, resulting in massively increased costs. Instead, the County encourages the Court to look to other Maryland cases, such as *Davis v. Dyncorp*, 336 Md. 226 (1994), to guide it in this case and reject Quinlan's claim.

Quinlan maintains that the jury was entitled to find that his degenerative knee tears were a compensable occupational disease arising out of and in the course of his employment. He characterizes the County's argument as asking the court to re-weigh the facts, as opposed to taking issue with the law itself. Pointing to expert testimony, Quinlan contends there was sufficient evidence that his knee degeneration and meniscal tears are characteristic of his employment, especially considering the occupational disease need not

12

be "unique" to paramedics alone. He also argues that there was sufficient evidence for the jury to find a causal relationship between his occupation and the degenerative meniscal tears.

The Workers' Compensation Act provides compensation for, among other things, "covered employees" who become "partially or totally incapacitated" due to an "occupational disease" acquired in the course of their employment. LE § 9-502(a). "Occupational disease" is defined in LE § 9-101(g) as a disease contracted "(1) as a result of and in the course of employment; and (2) that causes the covered employee to become . . . incapacitated." Alone, this definition is quite broad, but employer liability is limited when this provision is read in conjunction with LE § 9-502(d). Under this section, occupational diseases are compensable only if the following statutory conditions are met:

> (1) the **occupational disease that caused the** death or **disability**:
>
>> (i) is **due to the nature of an employment in which hazards of the occupational disease exist** and the covered employee was employed before the date of disablement; or
>> (ii) . . . ; **and**
>
> (2) on the weight of the evidence, **it reasonably may be concluded that the occupational disease was incurred as a result of the employment** of the covered employee.

*Id.* § 9-502(d) (emphasis added). Determining applicability under this section can be divided into two steps. First, the court must identify the professional tasks of the specific employee, remembering that "function outweighs form." Clifford B. Sobin, 1 *Maryland Workers' Compensation* § 7.2, at 197 (2018). Next, the court determines whether: (a) the

13

"nature" of the employment includes the hazards of the ailment the employee suffers from to a greater degree than that present in general employment; and (b) whether the employee's job functions expose the employee to those hazards. *Id.* at 196–97.

We have already described the factual evidence presented regarding the tasks Quinlan performed as part of his paramedic role, and we will return to them below. We now move to the second "step" and consider our prior cases and how they contour the edges of what qualifies as a "hazard" within the "nature" of a given employment. It is useful to briefly note the history and development of the Workers' Compensation Act, as it relates to the development of our case law. Specifically, "[u]ntil 1939, the [General Assembly] did not recognize occupational disease as a compensable claim." *LeCompte v. United Parcel Serv., Inc.*, 90 Md. App. 651, 654 (1992). After the 1939 amendment, the Act contained a schedule of permissible occupational diseases which could be covered, but this approach was later liberalized in favor of the more general formulation seen today. *See Dyncorp*, 336 Md. at 234–35. The history of the Act illustrates a gradual loosening of interpretive strictures, but, still, we bear in mind "that the Act is designed to provide compensation to workers injured by the effects of industry . . . ." *Id.* at 235 (citation omitted).

The central issue here requires examining the degree to which, and how, the occupational injury must be "due to the nature of an employment in which hazards of the occupational disease exist," LE § 9-502(d)(1)(i). In an early and oft-quoted case, *Victory Sparkler & Specialty Co. v. Francks*, we defined an occupational disease as "one which arises from causes incident to the profession or labor of the party's occupation or calling."

14

147 Md. at 379. "[T]he conditions of employment which distinguish occupational diseases from ordinary diseases of life need not be unusual chemicals, fumes, and the like. They may be distinctive because familiar harmful events are present in unusual degree." Larson, 4 *Larson's Workers' Compensation Law* § 52.03[3][b], at 52-13.[4] Typically, the disease is "the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom, and is ordinarily slow and insidious in its approach." *Foble v. Knefely*, 176 Md. 474, 486 (1939). *See also* Sobin, *Maryland Workers' Compensation* § 7.1, at 193 ("Occupational diseases are generally caused by long-term exposures from multiple employments with a slow and insidious onset that may not be recognized for many years.").

We have frequently addressed issues surrounding the scope of the term "occupational disease." For example, we have assessed whether the occupational disease must be "unique" to the profession, as the County suggests. We discussed this issue in *Lettering Unlimited v. Guy*, 321 Md. 305, 306 (1990), wherein we examined "whether the claimant's bilateral carpal tunnel syndrome is an occupational disease or an accidental injury." In this case, Guy, an embroiderer and silk screener, developed carpal tunnel syndrome after seven years on the job. *See id.* at 308–09. In determining that the trial court did not err in finding that Guy's carpal tunnel syndrome was a compensable occupational disease, we stated that, "[w]hile **ordinary or usual job-related repetitive**

_____

[4] We have also defined "employment" in the context of LE § 9-502(d)(1)(i) as "mean[ing] the profession or general occupation in which the person is engaged." *King v. Bd. of Educ. of Prince George's Cty.*, 354 Md. 369, 381–82 (1999).

15

**trauma** cannot predicate a claim for accidental injury, it **might** form the basis for an occupational disease claim." *Id.* at 311 (quoting R. Gilbert & R. Humphreys, Jr., *Maryland Workers' Compensation Handbook* § 5.1, at 84–85 (1988)) (emphasis added).

*LeCompte* further expounded upon our reasoning in *Lettering Unlimited*. In *LeCompte*, the Court of Special Appeals investigated a claim of occupational disease brought by a UPS "jumper"—a job requiring the employee to leap 14–16 inches from a truck—who had worked on the job for less than a month. *See id.* at 652. In denying the employee's claim, the intermediate appellate court recognized, pursuant to *Lettering Unlimited*, that "the lack of 'distinctive' or 'unusual' employment hazards [was] not dispositive." *Id.* at 658. Still, the claim failed because there must be a "repetitive character" to such trauma, which the employee did not suffer, given that her "condition manifested itself the first week on the job." *Id.*

We have also discussed the relationship between the "hazards" of the employment, the alleged occupational disease, and the "nature" of the employment at issue in a given case. In *Davis v. Dyncorp*, 336 Md. at 227, we discussed this in terms of whether Davis' "mental disease, allegedly resulting from on-the-job harassment," was within the dictates of LE § 9-502(d)(1)(i). In that case, Davis was a computer operator, a job which typically involved data entry, and alleged that "harassment" by his fellow employees caused him to develop a "mental disease." *Id.* at 237. This harassment included allegations that an "explosive cigarette" was provided to him, someone placed a tack on his seat, he was denied use of the refrigerator unless he paid $10, along with other similarly childish acts. *Id.* at 228.

16

To determine whether Davis' mental disease was within the "general character" of his employment, we evaluated whether the hazards of data operation exposed him to risk factors that could naturally lead to such mental disease. *See id.* We concluded that Davis' claim was "not compensable under [LE] § 9-502(d)(1)(i) because it was not 'due to the nature of an employment in which hazards of the occupational disease exist." *Id.* at 236. This is because "harassment by fellow employees is not a **hazard** within the nature of the employment of a computer data operator." *Id.* at 237 (emphasis added). *See also Means v. Balt. Cty.*, 344 Md. 661, 670 (1997) ("[U]nlike the occupation of computer operator in *Davis*, the occupation of paramedic is 'an employment in which hazards of the occupational disease [of PTSD] exist.'").

*Black & Decker Corp. v. Humbert*, 189 Md. App. 171, 174 (2009), involved an employee, Humbert, employed as a licensed electrician, who brought an occupational disease claim citing impingement syndrome of the right shoulder. His duties primarily included doing electrical repair work on ceilings, vehicle maintenance work, and some work as a plumber and carpenter. *See id.* at 175. After developing impingement syndrome, Humbert had an operation to remove a bone spur—a defect likely preexisting his employment—which appeared to have cured the problem. *See id.* at 176. Humbert's expert witness testified that "it takes two things to develop" a shoulder impingement issue: (1) "activities such as continuous reaching overhead"; and (2) "the presence of a spur." *Id.* at 177.

Ultimately, the intermediate appellate court concluded that the hazards leading to shoulder impingement syndrome were inherent in the nature of a licensed electrician's

17

profession. In deciding this, it explained that "a hazard is a risk factor. To be compensable, it is the risk factors, not the disease, that must inhere in the nature of the employment." *Id.* at 187. To support this conclusion, the court pointed to both *Davis* and *Means*, described above. *See id.* at 187–88. Both Humbert and his expert testified that "repeated overhead arm motions" were a hazard inherent in the job of an electrician. *Id.* at 186. Such motions, paired with a bone spur, would cause shoulder impingement syndrome. *See id.* Hence, the repeated overhead reaching—the risk factor—was inherent in the occupation and the shoulder impingement syndrome was compensable. We think this case was well-reasoned and supported by a plain reading of the Workers' Compensation Act. To the extent that the County asks us to overrule it, we decline to do so. *See also Allied-Signal, Inc. v. Bobbitt*, 96 Md. App. 157, 167–69 (1993), *rev'd on other grounds*, 334 Md. 347 (1994) (testimony established that "even if the arthritis effected the development of the shoulder condition, the condition was due in part to the characteristics of [Bobbitt's] employment" and there was evidence that the syndrome was a "direct consequence of the requirements of [her] occupation").[5]

---

[5] The County and one of the amicus curiae argue that such a reading is incorrect. The amicus brief filed on behalf of various Maryland counties, the Prince George's County School Board, and the City of Cumberland proposes that we should read LE § 9-502(d)(1)(i) to require that, to be a compensable occupational disease, the **disease** must be inherent in the nature of employment, not the risk factors for the disease. The parties state that this is the "plain language" meaning of the phrase "due to the nature of an employment in which hazards of the occupational disease exist." LE § 9-502(d)(1)(i). We do not think these words so obvious. In fact, a plain reading would suggest that it is, indeed, the "hazards" that must "exist" in the "nature" of the employment. Still, even if this statute were ambiguous, we struggle to see how the differing interpretations make a difference in practice, or in this case. There was expert testimony supporting a finding for Quinlan based on either reading: whether it is the hazards of the disease that must be in the nature of the

Our interpretation of the scope of "occupational disease," as confined by LE § 9-502, is consistent with decisions from other states interpreting similar statutes. *See, e.g.*, *Hansen v. Gordon*, 602 A.2d 560, 563 (Conn. 1992) ("[T]he requirement that the disease be 'peculiar to the occupation' and 'in excess of ordinary hazards of employment,' refers to those diseases in which there is a causal connection between the duties of the employment and the disease contracted by the employee. In other words, it need not be unique to the occupation of the employee or to the work place . . . ."); *Dennis v. Dep't of Labor & Indus. of State of Wash.*, 745 P.2d 1295, 1303 (Wash. 1987) ("We hold that a worker must establish that his or her occupational disease came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment. The conditions need not be peculiar to, nor unique to, the worker's particular employment."); *Crossett Sch. Dist. v. Gourley*, 899 S.W.2d 482, 483 (Ark. Ct. App. 1995) ("The fact that the general public may contract a disease is not controlling; the test of compensability is whether the nature of the employment exposes the worker to a greater risk of the disease than the risk experienced by the general public or workers in other employments.") (citations omitted); *Harvey v. Raleigh Police Dep't*, 355 S.E.2d 147, 150 (N.C. Ct. App. 1987) ("A disease need not be unique to the employee's occupation in order

---

employment—Cochran and Quinlan testified that repetitive kneeling and squatting were essential job functions of a paramedic—or the occupational disease that must be inherent in the nature of the employment—Cochran and Hinton both stated that paramedic/firefighters experience higher rates of degenerative knee conditions than the general population.

19

to qualify as an occupational disease," only that employment exposed him to greater risk than the public generally).

The above cases are instructive here. Taking the issues as presented by the County, we first explore "whether the specific characterization of the claim was legally sufficient as an occupational disease under LE § 9-502." We note that, while the Claim Form may only have asserted that Quinlan "developed meniscal tears" in his right knee due to his job duties as a paramedic, his occupational disease was described repeatedly as "degenerative meniscal tears," or something to that effect, throughout all stages of the trial. The Commission, in denying Quinlan's claim, described the alleged occupational injury as involving "[r]ight [k]nee degenerative tears." In memoranda to the motion for summary judgment, both parties referred to the claim as one for a "degenerative" occupational disease. Moreover, throughout trial, both parties consistently referred to the meniscal tears and osteoarthritis as being part of the same claim, and the jury found that Quinlan proved the "occupational disease of right knee degenerative tears . . . ."

Even if the knee degeneration and meniscal tears were not so evidently linked throughout the trial, the evidence presented to the jury characterized meniscal tears and the degenerative effects of osteoarthritis as being one-in-the-same ailment. Accordingly, this is not a claim involving a "preexisting condition" as the County urges. Cochran described the meniscal tears as "part of the continuum of osteoarthritis," as the tears "extend[ed] to the articular surface of the tibia," which "is where the bones come together," and can lead to osteoarthritis. Even the County's expert recognized their interrelation. Thus, the

20

"specific characterization of the claim" is legally sufficient, and we see no reason to conclude that the jury was not entitled to rely on this characterization.

Next, we inquire as to whether a claim for "degenerative tears of the posterior horn of both the medial and lateral meniscus" qualifies "as a matter of law as an occupational disease for a Paramedic/Firefighter." At issue, first, is whether the degenerative meniscal tears were "due to the nature of an employment in which hazards of the occupational disease exist," per LE § 9-502(d)(1)(i). Then, we ask whether it "reasonably may be concluded" that the degenerative meniscal tears were caused by the hazards inherent in Quinlan's employment. *Id.* § 9-502(d)(2).

Again, an occupational disease is "one which arises from causes incident to the profession or labor of the party's occupation or calling." *Victory Sparkler*, 147 Md. at 379. We look to the "duties of a claimant's profession" and determine whether "the hazard that led to the disease exists in the nature of that employment." *Black & Decker*, 189 Md. App. at 191. Here, there was a legal basis to conclude that the nature of paramedic/firefighter work, in general, involves a higher degree of risk for developing degenerative knee conditions. Quinlan presented evidence, identified as reliable by both experts, demonstrating that paramedic/firefighters have "significant" risk of developing osteoarthritis, relative to the general population—293 cases of degenerative knee tears for every 100 cases in the general population. Moreover, he introduced evidence from the Centers for Disease Control describing "occupations involving repetitive knee bending and squatting" as risk factors for osteoarthritis. Cochran also testified to the hazards inherent in Quinlan's "essential job functions" as a paramedic consisting of "considerable repetitive

21

kneeling, bending, [and] stress on the knee . . . ." Thus, the hazards that led to the development of degenerative knee conditions were adequately demonstrated to be within the ambit of a paramedic's natural role.

Defense expert Hinton did not quarrel with the claimant's characterization of paramedic work but stated that these job functions were not distinct from any other labor-intensive employment. The County, too, points to the commonality of knee injuries among other professions as disqualifying here. Assuming, without deciding, that such a characterization is accurate, "uniqueness" is not a required element of LE § 9-502(d)(1)— being within the "nature" of the employment is the precise statutory language. *See also Victory Sparkler*, 147 Md. at 379 (occupational disease must have "its origin in the inherent nature or mode of work of the profession or industry, and it is the usual result or concomitant"). As Judge Andrea Leahy wrote for the court below, "the Act does not limit occupational diseases to rare diseases or those exclusive to a specific profession." *Quinlan*, 238 Md. App. at 508. In *Lettering Unlimited*, 321 Md. at 311, we recognized that "ordinary or usual job-related repetitive trauma" can form the basis of an occupational disease claim, which is wholly consistent with our historical characterization of the "slow and insidious" nature of occupational diseases. *Foble*, 176 Md. at 486.

An analysis of Quinlan's job duties, too, must reveal that he actually engaged in the kinds of activities that contribute to the increased risk inherent in his profession. Quinlan described his job-related tasks as including kneeling for lengthy periods of time, carrying heavy patients up and down stairs, kneeling to address patients and administer aid, climbing in and out of emergency vehicles, carrying up to 50 pounds of gear, and lifting patients

22

onto stretchers and up and down stairs. While engaged in this work, he favored his right knee. Cochran testified that repetitive use was the primary cause of Quinlan's degenerative knee condition. Indeed, Quinlan described his 24-year career as a paramedic with Baltimore County wherein he typically worked four-day shifts. During each four-day shift, he would generally take up to 30 emergency trips which would last approximately 1–2 hours, depending on the seriousness of the emergency. During each of these trips, he would perform the above tasks, described as consisting of "considerable repetitive kneeling, bending, [and] stress on the knee . . . ."

It is inconsequential that degenerative knee conditions are not exclusively within the purview of paramedic work. Rather, we look to evidence that "repetitive trauma" was a factor in Quinlan's condition. The above evidence demonstrates that Quinlan's degenerative knee condition likely developed progressively, results from repetitive trauma, and stems from the natural consequences of his job functions.

The County argues that a decision upholding Quinlan's award will result in all "heavy labor" workers now having a claim any time "strenuous physical activity required by the job contributes in any way to an injury or aggravation of an underlying pre-existing degenerative condition." We are not persuaded that such reasoning should govern. First, the County mischaracterizes the present occupational disease when it states that it involves a preexisting condition. Again, upon review, we do not "weigh evidence or assess credibility" regarding findings of fact. Gilbert, *Maryland Workers' Compensation* § 16.08, at 16-16. As discussed above, Cochran testified that the meniscal tears were part of the "continuum" of osteoarthritis, and thus, one condition did not precede the other, but they

23

were the same condition. The jury appears to have accepted this finding based on their verdict, and we do not disturb it.

We would also be remiss if we did not, again, note that the General Assembly requires hazards to be in the "nature" of the occupation, not unique to it. The General Assembly, with its investigative resources, is positioned to know the burdens imposed on employers and their insurers when it enacts a law with such plain language. Its role is to make a policy decision that takes into account both the employer/insurer's burden and the plight of workers who are injured on the job because of repetitive trauma. We should not change the meaning of the statute by adding qualifying language which would limit workers' entitlement to relief. Additionally, "whether an occupational disease is compensable under [LE] § 9-502(d)(1)(i) . . . is primarily controlled by the facts." *Bridgett v. Montgomery Cty.*, 186 Md. App. 616, 628 (2009). Thus, each case is reviewed individually to determine if the elements required by the statute have been met.

Indeed, our recognition of Quinlan's right to recover here is no more expansive than other claims we have previously deemed compensable. *See, e.g.*, *Means*, 344 Md. at 662 (post-traumatic stress disorder); *Lettering Unlimited*, 321 Md. at 306 (bilateral carpal tunnel syndrome); *Miller v. Western Elec. Co.*, 310 Md. 173, 176 (1987) (carpal tunnel syndrome); *Black & Decker*, 189 Md. App. at 174 (impingement syndrome of the right shoulder). Other jurisdictions have demonstrated the same. *See* Larson, 4 *Larson's Workers' Compensation Law* § 52.04[2], at 52-27 (listing a multitude of diseases that have been determined "occupational" in other jurisdictions).

24

Finally, we must evaluate whether, as a matter of law, the jury "reasonably may [have] concluded," LE § 9-502(d)(2), that the degenerative meniscal tears were caused by Quinlan's employment. Again, Cochran affirmatively testified that Quinlan's job functions caused his degenerative meniscal tears. She attributed this to the repetitive use of his right knee over the course of his career as a paramedic and stated that gender, age, and weight were unlikely to be primary factors because Quinlan's knee damage was confined to right knee. The County's own expert, Hinton, also described Quinlan's employment as the "potential" or "arguable" cause of his knee condition, although maintaining that he did not believe it to be the primary cause. This, along with the above evidence, was enough for the jury to "reasonably" infer causation.

## CONCLUSION

In sum, the record contained evidence that the nature of the job of a paramedic/firefighter places one at greater risk for degenerative knee conditions, Quinlan's job required that he engage in the activities that account for this increased risk, and that he engaged in these activities repetitively over 24 years of employment. Moreover, there is evidence that the employment actually caused the degenerative tears. As a matter of law, degenerative meniscal tears should not be excluded from the universe of occupational diseases. And there was sufficient evidence for the jury to reasonably conclude that Quinlan's degenerative knee tears were "due to the nature of an employment in which hazards of the occupational disease exist," LE § 9-502(d)(1)(i). Therefore, the jury was within its power to find that Quinlan "sustain[ed] an occupational disease of right knee degenerative tears of the . . . medial and lateral menisci . . . arising out of and in the course

25

of his employment[.]"  For these reasons, we affirm the judgment of the Court of Special

Appeals.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Baltimore County
Case No. 03-C-16-004811
Argued: February 5, 2019

IN THE COURT OF APPEALS
OF MARYLAND

No. 50

September Term, 2018

_____

BALTIMORE COUNTY, MARYLAND

v.

MICHAEL QUINLAN

_____

Barbera, C.J.
*Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally D.,
   (Senior Judge, Specially Assigned)

JJ.

_____

Dissenting Opinion by Getty, J.

_____

Filed: August 26, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Respectfully, I dissent.

In my opinion, Mr. Quinlan failed to accurately identify the medical condition at issue as an occupational disease and to prove that his disability was distinctly associated with his occupation. An occupational disease is compensable only if "(1) the occupational disease that caused the death or disability: (i) is due to the nature of an employment in which hazards of the occupational disease exist . . . and (2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee." LE § 9-502(d).

The majority asserts that the complainant must prove facts sufficient for the court to determine "whether: (a) the 'nature' of the employment includes the hazards of the ailment the employee suffers from to a greater degree than that present in general employment; and (b) whether the employee's job functions expose the employee to those hazards." *Majority Opinion*, at 13-14.

I disagree with the majority that under the facts of this case, a clear syndrome or disease was identified. There was both degenerative osteoarthritis and a degenerative meniscus condition present in Mr. Quinlan's right knee. He had the burden to properly identify the alleged occupational disease in his claim and failed to do so. Over the course of these proceedings, the description of the disease evolved from "torn meniscus" to "degenerative tears of the meniscus" to "osteoarthritis with degenerative tears."

I am concerned that Mr. Quinlan, and future litigants under similar unclear medical claims, will bootstrap additional conditions under the same claim and encompass the additional condition within an occupational disease. For example, here, Mr. Quinlan's

claim of meniscal tears was exacerbated by the osteoarthritis. The osteoarthritis is a pre-existing condition that should have been further accounted for in the testimony and evidence of this case. Otherwise, I believe this Court is broadly expanding worker's compensation coverage into coverage of common diseases of aging or lifestyle. This expansion chips away at the requirement that the workplace or employment is an actual cause of the occupational disease. The result of this expansion could open employers and insurers to potentially bear the full cost of a worker's pre-existing or underlying condition due to an aggravation of that condition caused in any degree and manner by the occupation.

I am also concerned that the majority's decision, combined with *Black and Decker Corporation v. Humbert*, 189 Md. App. 171 (2009), permits a broad range of coverage where employees engage in activity common to many occupations as long as the occupation increases the risk of contracting a disease. This decision may result in a significant increase in claims for occupational disease by those with underlying arthritic conditions who work in physically demanding jobs. Potentially, every worker will be able to successfully file a claim for an occupational disease whenever a strenuous physical activity is required by the job and that activity contributes in any way to an injury or aggravation of an underlying pre-existing degenerative condition. I do not think Mr. Quinlan has sufficiently proven that his condition was the result of distinctive employment hazards. Specifically, the condition of degenerative meniscal tears was not proven to be inseparable from the occupation of an EMT or paramedic.

Therefore, for the foregoing reasons, I respectfully dissent.

2